No. 21-1739

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| MICHAEL L. SHAKMAN and PAUL M. LURIE, individually and on behalf of others similarly situated, | ) ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 1:69-cv-02145 |
| JB PRITZKER, in his official capacity as Governor of the State of Illinois, | ) ) ) | The Honorable |
| Defendant-Appellant. | ) ) ) | EDMOND E. CHANG, Judge Presiding. |

**BRIEF AND REDACTED SHORT APPENDIX OF
DEFENDANT-APPELLANT GOVERNOR JB PRITZKER**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

**ALEX HEMMER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 725-3834
ahemmer@atg.state.il.us

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...................................................................................iii

INTRODUCTION .............................................................................................1

JURISDICTIONAL STATEMENT.....................................................................3

ISSUE PRESENTED ........................................................................................4

STATEMENT OF THE CASE ...........................................................................5

    A.    Plaintiffs file suit in their capacities as candidates, voters, and taxpayers. .........................................................................................5

    B.    The case expands, the parties enter into a consent decree, and this Court imposes limits on the proceedings. ...................................6

    C.    After forty years, a special master is appointed for the State. ...............10

    D.    The State establishes robust procedures to ensure that its hiring practices do not violate federal law.........................................13

    E.    The district court denies the State's motion to vacate the consent decree and expands the special master's role. ...................................16

SUMMARY OF ARGUMENT ...........................................................................19

ARGUMENT .....................................................................................................21

I.    The Court Reviews The Denial Of The State's Motion For Abuse Of Discretion, But Reviews Legal Questions De Novo...........................................21

II.    The Consent Decree's Purpose Has Been Satisfied. .........................................22

    A.    The State has complied for decades with the decree's prohibition on coerced political work.................................................................23

    B.    No matter how it is interpreted, the consent decree has been satisfied. .........................................................................................27

III.    Applying The Consent Decree Prospectively Is No Longer Equitable. ............33

A.     Plaintiffs lack standing to superintend the State's compliance with *Rutan*. ................................................................................34

B.     The proceedings below offend principles of federalism and are not reasonably tailored to any identified legal violation.................................38

IV.   The District Court Erred In Denying The State's Motion To Vacate The Consent Decree. ..........................................................................42

A.     The district court erred in misreading the consent decree to encompass *Rutan* violations...................................................43

B.     The district court erred in concluding that the State has not implemented a durable remedy. ............................................48

C.     The district court erred in permitting these proceedings to continue absent plaintiffs with Article III standing. ..............................52

CONCLUSION ....................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF RULE 30 COMPLIANCE

REDACTED SHORT APPENDIX

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bank of Commerce v. Hoffman,*
   829 F.3d 542 (7th Cir. 2016) ............................................................ 46

*Bogard v. Wright,*
   159 F.3d 1060 (7th Cir. 1998) ............................................................ 3

*Branti v. Finkel,*
   445 U.S. 507 (1980) ............................................................ 13

*Carney v. Adams,*
   141 S. Ct. 493 (2020) ............................................................ 34

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ............................................... 34, 37, 54

*Evans v. City of Chicago,*
   10 F.3d 474 (7th Cir. 1993) (en banc) ................................... 41

*Frew ex rel. Frew v. Hawkins,*
   540 U.S. 431 (2004) ...............................28, 38, 41, 50, 52, 55

*Frew v. Janek,*
   780 F.3d 320 (5th Cir. 2015) ............................................................ 22

*Holmes v. Godinez,*
   991 F.3d 775 (7th Cir. 2021) ................................................. 21, 43

*Horne v. Flores,*
   557 U.S. 433 (2009) ............................................................*passim*

*Jackson v. Los Lunas Community Program,*
   880 F.3d 1176 (10th Cir. 2018) ...............................28, 42, 48, 52

*J.B. v. Woodard,*
   997 F.3d 714 (7th Cir. 2021) ............................................................ 34

*Jeff D. v. Otter,*
   643 F.3d 278 (9th Cir. 2011) ............................................................ 22

*John B. v. Emkes*,
852 F. Supp. 2d 957 (M.D. Tenn. 2012) .............................................................. 42

*John B. v. Emkes*,
710 F.3d 394 (6th Cir. 2013) ...........................................28, 32, 42, 48, 51

*Lewis v. Casey*,
518 U.S. 343 (1996) ...........................................................28, 30, 31, 49, 51

*Lewis v. Continental Bank Corp.*,
494 U.S. 472 (1990) .................................................................................. 34

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
478 U.S. 501 (1986) .......................................................................... 23, 25

*Milliken v. Bradley*,
433 U.S. 267 (1977) .................................................................................. 38

*Minnesota Life Insurance Co. v. Kagan*,
724 F.3d 843 (7th Cir. 2013) .................................................................. 44

*O'Sullivan v. City of Chicago*,
396 F.3d 843 (7th Cir. 2005) ............................................... 9, 10, 34, 37

*Peery v. City of Miami*,
977 F.3d 1061 (11th Cir. 2020) ....................................22, 26, 28, 32, 48

*People's Gas Light & Coke Co. v. Beazer E., Inc.*,
802 F.3d 876 (7th Cir. 2015) .................................................................. 24, 25

*People Who Care v. Rockford Board of Education, School District 205*,
246 F.3d 1073 (7th Cir. 2001) .............................................................. 33, 49

*Philos Technologies, Inc. v. Philos & D, Inc.*,
802 F.3d 905 (7th Cir. 2015) .................................................................. 21, 48

*Plotkin v. Ryan*,
1999 WL 965718 (N.D. Ill. Sept. 29, 1999) ...................................... 36

*Rutan v. Republican Party of Illinois*,
868 F.2d 943 (7th Cir. 1989) (en banc) .......................................... 26, 37

*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990) .................................................................................*passim*

*Salazar by Salazar v. District of Columbia,*
    896 F.3d 489 (D.C. Cir. 2018)................................................................22, 28, 31, 49

*Shakman v. City of Chicago,*
    426 F.3d 925 (7th Cir. 2005) ...................................................9, 10, 35, 38, 42, 53, 54

*Shakman v. Clerk of Cook County,*
    994 F.3d 832 (7th Cir. 2021) ...................................................2, 3, 10, 21, 26, 37, 38

*Shakman v. Democratic Organization of Cook County,*
    310 F. Supp. 1398 (N.D. Ill. 1969) ...........................................................................5

*Shakman v. Democratic Organization of Cook County,*
    435 F.2d 267 (7th Cir. 1970) ...........................................................................*passim*

*Shakman v. Democratic Organization of Cook County,*
    481 F. Supp. 1315 (N.D. Ill. 1979) ...........................................................................7

*Shakman v. Dunne,*
    829 F.2d 1387 (7th Cir. 1987) .........................................................................*passim*

*Valley Forge Christian College v. Americans United for Separation of Church &*
    *State, Inc.,* 454 U.S. 464 (1982)............................................................................ 38

*Warth v. Seldin,*
    422 U.S. 490 (1975) .................................................................................... 26, 54

## Statutes and Rules

21 U.S.C. § 2107.......................................................................................................3

28 U.S.C.
    § 1292 ...............................................................................................................3
    § 1331 ...............................................................................................................3
    § 1343 ...............................................................................................................3

42 U.S.C.
    § 1983 ...............................................................................................................3
    § 1985 ...............................................................................................................3
    § 1986 ...............................................................................................................3
    § 1988 ...............................................................................................................3

5 ILCS
    430/5-15 ..........................................................................................................14

430/5-30 ............................................................................................ 14

430/20-20 ......................................................................................... 14

Fed. R. App. P. 4 .............................................................................. 3

Fed. R. Civ. P. 60 .............................................................21, 22, 23, 27, 37

**INTRODUCTION**

Fifty years ago, the State of Illinois entered into a consent decree to resolve claims that the State—like dozens of other governmental entities—maintained a political patronage machine that relied on the labor of public employees to sustain the political fortunes of the incumbent party. That decree bars the State from requiring public employees to perform partisan political service as a condition of continued employment—a prohibition with which the State has complied for decades.

This case then sat dormant for forty years. In 2014, motivated by allegations that former Governor Rod Blagojevich and his associates had misused public positions for their own ends, plaintiffs resuscitated these proceedings as a platform for superintending the State's compliance with an intervening Supreme Court decision prohibiting the consideration of political factors in public hiring, *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990). Plaintiffs' revival of the consent decree was improbable: Not only does the decree disclaim an intent to affect "hiring," this Court has previously held that plaintiffs—a voter and a candidate for public office—lack Article III standing to challenge hiring practices. But the district court nonetheless appointed a special master to oversee the State's compliance with the decree. Over the last seven years, the State has invested substantial time and resources making significant reforms to its hiring practices to ensure that the abuses identified in 2014 cannot be repeated.

But the time has come to end these proceedings and terminate the consent decree under which they operate. This Court has repeatedly recognized the

"federalism concerns" posed by the decades-long supervision in this case of the day-to-day operations of state and local governments. *Shakman v. Clerk of Cook Cnty.* ("*Shakman VI*"), 994 F.3d 832, 843 (7th Cir. 2021). The proceedings below exemplify these concerns. Ongoing federal oversight of a State's operations can be justified only by evidence of ongoing violations of federal law—but neither the plaintiffs, the special master, nor the district court have identified any ongoing violations of the consent decree, *Rutan*, or any other federal law, much less the kind of systemwide violations necessary to warrant continued statewide oversight. Instead, plaintiffs and the special master have identified only increasingly specific human-resources reforms that they posit could prevent such violations in the future. And rather than terminate the decree, as is warranted by the State's demonstrated commitment to compliance with federal law, the district court expanded the special master's remit to encompass oversight of further human-resources reforms—reforms to which the State is committed, but whose adoption is not required by federal law, and whose superintendence by the district court and the special master, and by plaintiffs who lack any concrete stake in this case, is inconsistent with basic principles of federalism and the separation of powers.

# JURISDICTIONAL STATEMENT

Plaintiffs filed this action in 1969, asserting violations of the First, Fifth, and Fourteenth Amendments and 42 U.S.C. §§ 1983, 1985, 1986, and 1988. A17 (¶38).[1] They invoked the district court's subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. A2 (¶1(b)). In 1972, plaintiffs and then-Governor Richard Ogilvie were among the parties who entered into a consent decree intended to resolve plaintiffs' claims. A38-39 (¶C). The district court retained jurisdiction to enforce the decree, A41 (¶H(2)), and the proceedings below rest on that provision. But as discussed below, *infra* pp. 34-38, plaintiffs lack Article III standing to assert employment-related claims against the State, and so the district court would not have jurisdiction over this case absent the decree's entry.

The district court entered an order denying the State's motion to vacate the consent decree on March 31, 2021. SA1. The State filed a notice of appeal on April 26, 2021, Doc. 7404, which was timely under 21 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1)(A) because it was filed within 30 days of the district court's order.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1). A consent decree operates as an injunction, and the denial of a motion to "dissolve [a] [consent] decree" is "appealable" under section 1292(a)(1). *Bogard v. Wright*, 159 F.3d 1060, 1065 (7th Cir. 1998); *accord Shakman VI*, 994 F.3d at 839.

---

[1] Entries on the district court's docket are cited "Doc. __"; the short appendix is cited "SA__"; and the separate appendix is cited "A__."

# ISSUE PRESENTED

Whether the district court erred in denying the State's motion to vacate the consent decree.

## STATEMENT OF THE CASE

**A.  Plaintiffs file suit in their capacities as candidates, voters, and taxpayers.**

In 1969, Michael Shakman, an attorney aspiring to serve as an independent delegate to the 1970 Illinois constitutional convention, and Paul Lurie, his friend and supporter, filed this lawsuit against the Cook County Democratic Organization, the City of Chicago, and multiple county, city, and party officers.  A2-6 (¶¶1-18).  Shakman brought claims "as a candidate for public office," and both plaintiffs brought claims "as voters" and "taxpayers."  A2 (¶1(a)).  They argued that the Organization's "pervasive" influence in county and city government had led to the establishment of a "political patronage system," under which many county and city employees were required to contribute time and money to the Organization and its political candidates in order to retain their jobs.  A7-13 (¶¶19-32).  This practice, plaintiffs argued, made it difficult for independent candidates to run for office, and in doing so violated their constitutional rights, including by depriving them "of their right to an electoral process which is rudimentarily fair and free of substantial partisan influence."  A20 (¶38).

The district court dismissed the action, reasoning among other things that plaintiffs sought to "assert the rights of others"—specifically, the public employees allegedly "coerced into making involuntary contributions of time and money"—and so lacked Article III standing.  *Shakman v. Democratic Org. of Cook Cnty.*, 310 F. Supp. 1398, 1400-02 (N.D. Ill. 1969), *rev'd*, 435 F.2d 267 (7th Cir. 1970).  "[T]he proper parties to assert that those deprivations amount to unlawful violations of

their civil rights," it explained, "are the patronage employees, not plaintiff[s]." *Id.* at 1401.

A divided panel of this Court reversed in a three-page opinion. *Shakman v. Democratic Org. of Cook Cnty.* ("*Shakman I*"), 435 F.2d 267, 269 (7th Cir. 1970). The majority reasoned that plaintiffs had adequately pled constitutional violations, insofar as candidates for public office had constitutionally protected "interests . . . in an equal chance" to run for office and voters had constitutionally protected interests in having a "voice in government of equal effectiveness with other voters." *Id.* at 270.[2] Given its view that such rights were constitutionally protected, the majority stated, plaintiffs' "standing to bring [suit] . . . is apparent." *Id.* at 269. Then-Chief Judge Swygert dissented, concluding that the complaint presented nonjusticiable political questions: Even "[a]ssuming proof of the claims," he observed, "it is not difficult to contemplate the problems facing the district court in molding a proper remedy and, perhaps more important, with its enforcement." *Id.* at 271 (Swygert, C.J., dissenting).

**B.    The case expands, the parties enter into a consent decree, and this Court imposes limits on the proceedings.**

*The Consent Decree.* On remand, the case expanded and proceeded forward as what is now called "institutional reform litigation," *Horne v. Flores*, 557 U.S. 433, 447 (2009)—i.e., an ongoing effort by a federal court, aided by the parties, to oversee

---

[2] The court did not decide whether plaintiffs were entitled to bring claims in their capacity as taxpayers, *id.* at 269, and plaintiffs have not subsequently argued that they are.

the remediation of alleged legal violations.  The parties began settlement negotiations, and in 1971 submitted a proposed consent decree to the district court. *Shakman v. Democratic Org. of Cook Cnty.*, 481 F. Supp. 1315, 1323 (N.D. Ill. 1979), *rev'd sub nom. Shakman v. Dunne* ("*Shakman II*"), 829 F.2d 1387 (7th Cir. 1987). As part of that process, plaintiffs filed an amended complaint adding numerous Republican Party organizations and public officials, including then-Governor Ogilvie, as defendants. A68-73 (¶¶8-16).  The amended complaint included allegations against the Republican Party defendants that were substantively identical to the original complaint's allegations against the original defendants—contending that an analogous system of Republican patronage employment existed in the Chicago suburbs, and that this system injured independent candidates and voters in Illinois. A74-79 (¶¶20-33).  Governor Ogilvie signed the consent decree, which the parties agreed would apply to all "State of Illinois jobs in the Northern District of Illinois under the [Governor's] jurisdiction and control," A42, and in 1972 the district court approved the consent decree and entered it as a class settlement, *Shakman*, 481 F. Supp. at 1323.

The substantive provisions of the 1972 consent decree are brief.  Paragraph D "declare[s]" all public employees, "once hired, . . . free from all compulsory political requirements in connection with [their] employment."  A40 (¶D).  And Paragraph E, in relevant part, enjoins the defendants from

> (1)  conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor[;] [and]

> (2)     knowingly causing or permitting any employee to do any partisan political work during the regular working hours of his or her governmental employment, or during time paid for by public funds[.]

*Id.* (¶E).  At its core, as this Court has explained, the decree prohibits a system of "coerced political work demanded of those already employed by the government as a condition of continued employment."  *Shakman II*, 829 F.2d at 1398.

The consent decree separately set out three "questions" that the parties agreed to reserve for further litigation and conferred jurisdiction on district court to "enable" that litigation.  A40 (¶H(1)).  One of those was whether and to what extent "political sponsorship or other political considerations" could "be taken into account in hiring employees."  A41 (¶H(1)(b)).  Over the next thirty years, that question was the focus of continued proceedings between plaintiffs and many non-State defendants.

*Shakman II*.  When plaintiffs and those defendants first litigated the hiring question reserved in 1972, the district court, believing itself bound by *Shakman I*, held that plaintiffs had standing to challenge the defendants' alleged practice of considering political affiliation in hiring, and held that practice unconstitutional.  481 F. Supp. at 1326-27, 1354.  The district court subsequently entered judgment enjoining those defendants from considering "any political reason or factor" in hiring most public employees.  *Shakman II*, 829 F.2d at 1390.  Some defendants stipulated to a second consent decree memorializing that judgment, while others appealed.  *Id.*

On appeal, however, this Court reversed on standing grounds, in doing so essentially limiting *Shakman I* to its facts.  *Shakman II*, 829 F.3d at 1399.  The court

observed that the consent decree's entry made *Shakman II* "a very different case" than *Shakman I*, given that it "raise[d] only the constitutionality of politically-motivated *hiring* practices." *Id.* at 1393 (emphasis in original). "More importantly," the court explained, changes in the law since *Shakman I* prevented it from giving that opinion "the precedential effect that [it] would normally accord such an earlier ruling of this court in the same litigation." *Id.* Considering the standing question on its merits, the court held that plaintiffs' standing theory was too "attenuated": Defendants' hiring practices could be understood to injure plaintiffs as candidates and voters only by "accept[ing] . . . speculative inferences and assumptions" about the behavior of third-party employees. *Id.* at 1398. "A plaintiff," the court noted, "cannot assert injury to his viability as a candidate or his influence as a voter simply on the basis—real or imagined—of incumbency." *Id.*

*Shakman III and IV.* The defendants that had previously agreed to the second consent decree, however, were not affected by *Shakman II*, and one such defendant, the City of Chicago, ultimately challenged that decree before the district court. *Shakman v. City of Chi.* ("*Shakman IV*"), 426 F.3d 925, 928 (7th Cir. 2005); *O'Sullivan v. City of Chi.* ("*Shakman III*"), 396 F.3d 843, 851-52 (7th Cir. 2005). The district court rejected the City's effort to vacate the decree, but on appeal this Court vacated its decisions and remanded. *Shakman IV*, 426 F.3d at 936; *Shakman III*, 396 F.3d at 868. This Court noted that the City could move to vacate the decree under Federal Rule of Civil Procedure 60(b), and that in reviewing such a motion the district court should "consider critically whether changes in the legal landscape since

9

1983 require modification or vacatur of that decree." *Shakman III*, 396 F.3d at 868. It emphasized that "concerns of federalism"—i.e., the burdens placed on states and localities by longstanding institutional reform decrees—"should factor strongly into the court's analysis." *Id.* And it added that the district court "must consider the significant changes in the law of voter standing" since the original decree's entry. *Id.* "As *Shakman II* makes clear," this Court admonished, "we have serious concerns whether the plaintiffs as voters bring to the litigation the sort of concrete adverseness" demanded by Article III. *Id.* On remand, this Court stated, "[t]he district court should be guided by the current law of standing to determine whether the class of voters has the necessary interest in this litigation 'to vigorously litigate and present the matter of [political patronage] to the court in the manner best suited for judicial resolution,' or whether that task is best left to individuals directly impacted by hiring decisions made by the City." *Shakman IV*, 426 F.3d at 936.

**C.     After forty years, a special master is appointed for the State.**

For four decades, while plaintiffs and the non-State defendants litigated the hiring question, the case "sat dormant" for the State. *Shakman VI*, 994 F.3d at 837. Though the complaint was amended several times to add additional plaintiffs and claims (including employees and job applicants asserting violations of their own rights), none of these plaintiffs brought claims against the State. *See* A87-123. And although plaintiffs sought and obtained supplemental relief against various non-State defendants, for decades they did not seek or obtain any such relief against the State.

As a result, today the State remains bound only by the first consent decree, entered in 1972.

Then, in 2009—almost forty years after that decree's entry—plaintiffs for the first time sought supplemental relief against the State. Doc. 1460. But they did not allege that the State continued to use a patronage system of the kind alleged in the complaint, under which state employees were required to invest resources in supporting incumbent-party candidates. Rather, plaintiffs claimed that the State was violating the Supreme Court's intervening decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), which held that political affiliation generally cannot be considered in hiring public employees, unless the position is "exempt" for one of various reasons. Doc. 1460 at 2. Plaintiffs alleged that former Governor Blagojevich had "maintained and operated an illegal patronage employment system" under which public employees were hired based on their political connections. *Id.* Plaintiffs sought an order "prohibiting the basing or conditioning of hiring" for certain positions "upon political sponsorship, support, or other impermissible political conditions or factors," and asked the court to appoint a special master to oversee the "[d]evelopment . . . of a hiring plan" for "non-exempt jobs" in the State. *Id.* at 5-6. The State opposed the motion, Doc. 1551; plaintiffs did not seek a hearing; and the district court took no action on it.

In 2014, plaintiffs renewed their motion, reprising their argument about Governor Blagojevich, who they contended had established a system that channeled "jobs, promotions, [and] other employment benefits" to the politically connected.

11

Doc. 3744 at 5-6.  Plaintiffs also alleged the existence of a scheme centered on "staff assistant" positions at the Illinois Department of Transportation ("IDOT")— positions inappropriately designated as "exempt" under *Rutan* and then filled based on political considerations.  *Id.* at 6-9.  They contended that then-Governor Patrick Quinn had "continued" the challenged practices for years after taking office, and that the practices "ended in early 2012" only after the State's Office of Executive Inspector General ("OEIG") had begun to investigate.  *Id.*  Plaintiffs asked the magistrate judge then presiding over the case to require the State to develop "a hiring, promotion, reassignment and employment plan for non-exempt positions" and "a list of employment positions that are properly exempt from the rules against political sponsorship."  *Id.* at 9-10.  They also sought discovery and the appointment of a special master to "investigate and recommend appropriate reforms in the employment practices for non-exempt jobs."  *Id.*  The judge denied plaintiffs' motion in part and granted it in part, declining to award discovery or injunctive relief but appointing a special master to "investigate the scope and reason for any violations of the 1972 Decree regarding" the IDOT scheme and recommend remedial measures relating to those violations.  A139.  The judge did not confer authority on the special master over non-exempt hiring, as plaintiffs had requested.  *Id.*

In 2016, plaintiffs asked the court to expand the special master's duties to encompass a review of all exempt positions at all agencies under the Governor's jurisdiction.  Doc. 4676.  Plaintiffs did not allege additional wrongdoing; rather, they argued again that the creation of a list of *Rutan*-exempt positions would "prevent

future abuses of the *Rutan*-exempt process statewide." *Id.* at 6. Over the State's opposition, the magistrate judge granted the motion. A143. The judge also did not identify any additional legal violations, or even allegations thereof; rather, the judge reasoned that conferring statewide authority on the special master would be "the most effective and efficient means" of improving "oversight policies" over statewide hiring. A145-46. The judge thus directed the special master to review every position designated as exempt from *Rutan* at every state agency to ensure that those positions "meet the . . . standards" for exempt treatment; "[d]evelop an approved and comprehensive list of all *Rutan* exempt positions across all agencies in the state"; and "[d]evelop procedures for correcting and revising" that list. A148-49; A151.

### D. The State establishes robust procedures to ensure that its hiring practices do not violate federal law.

Since 2014—during successive gubernatorial administrations of different parties—the State has devoted extensive time and resources to reforming its employment practices and procedures, and has established robust mechanisms to ensure that those practices comply with *Rutan* and its predecessors. Under *Rutan*, the State cannot hire or promote an employee based on his or her "political belief [or] association," 497 U.S. at 78, unless the position is "exempt" from that rule—usually because it involves "policymaking" or "confidential" duties, *see Branti v. Finkel*, 445 U.S. 507, 517-18 (1980). In the State's view, these reforms are not required by the 1972 consent decree, *infra* pp. 23-27, but several aspects are relevant here.

First, the State has established substantial internal mechanisms to ensure compliance with *Rutan* and with the consent decree. State law has for almost two

decades implemented *Rutan* and the consent decree by barring state employees from considering political factors in making hiring decisions and from requiring other state employees to perform political activities as a condition of continued employment. 5 ILCS 430/5-15, -30. In 2009, the General Assembly specifically authorized OEIG—the State's executive-branch inspector general—to patrol state agencies' "compliance with *Rutan*." *Id.* 430/20-20(9). OEIG, an independent agency with over 70 employees and a $7-million budget, has expansive jurisdiction to investigate allegations of misconduct within the executive branch. *Id.* 430/20-20. Its investigations have assisted the State in identifying and resolving a range of employment-related issues, including the IDOT investigation that originally prompted these proceedings, *supra* p. 11.

Shortly after the 2014 appointment of the special master, and to implement its statutory authority, OEIG established a compliance division specifically focused on employment practices—the Hiring & Employment Monitoring Division ("HEM"). HEM was established for the sole purpose of "review[ing] State hiring and processes in order to ensure the[y] are conducted" in accordance with applicable law "and are free from political and other manipulation." Doc. 6936 at 2. HEM's focus is on compliance with federal and state employment law and the policies and procedures put in place to ensure fair and transparent hiring practices. *Id.* As OEIG explained below, HEM's establishment reflects OEIG's investment of "significant time and resources" into that mission. *Id.* at 24. Today, HEM is staffed by ten employees who "work directly with agencies to implement, monitor, and enforce proper State hiring

practices and procedures"—work that OEIG has committed to continuing even if the consent decree is vacated. *Id.*

Second, over the last five years, and with the agreement of plaintiffs and the special master, and the district court's approval, the State has established an "exempt list"—a list of all positions statewide that are "exempt" from *Rutan* and its predecessors—and procedures for revising that list. Docs. 6158, 6180. These procedures provide substantial roles for both HEM and the Illinois Civil Service Commission—an independent adjudicative body established to review public employment disputes—to review and, if necessary, contest any proposals by the State to "exempt" a position from *Rutan*. Doc. 6158 at 6-9. The procedures, too, will remain in force if the consent decree is vacated. As the special master has explained, the "exempt list" was an "extraordinary accomplishment by the State," reflecting the "hard work" of many state employees across multiple administrations. Doc. 6306 at 4. The exempt list identifies 1,100 positions that are *Rutan*-exempt out of a workforce of roughly 50,000—a two-thirds reduction from the 3,500 labeled exempt at the outset of the State's work. The list, the special master observed in 2019, "will ensure that, going forward, the State fills only truly 'political' or 'policy-making' positions with political appointments" and "will help to ensure the integrity of the State's hiring practices." *Id.* Since the list's promulgation in January 2019, the special master has monitored over 500 exempt hires statewide and has not identified any significant issues with exempt hiring.

Finally, and more generally, the State has made significant systemwide changes to its hiring and employment processes, focusing its efforts for the past several years on the reforms recommended by the special master as priorities. The special master has acknowledged that the State has made "significant accomplishments and progress," including implementing many of the special master's most "significant recommendations." Doc. 7083 at 9-10; *accord* Doc. 6710 at 29 (explaining that the State has "engaged in a significant amount of work to improve [its] employment practices"); Doc. 6565 at 1 (observing that the State has "worked collaboratively" with plaintiffs "to accomplish significant progress"). During this period, the special master has identified no documented violations of *Rutan* or any other federal law.

**E.      The district court denies the State's motion to vacate the consent decree and expands the special master's role.**

In the fall of 2019, after implementing the exempt list and exempt hiring procedures for several months without issues, the State advised plaintiffs and the special master of its intent to seek vacatur of the 1972 consent decree. Doc. 6674. Plaintiffs instead asked the district court to expand the special master's authority, asserting that the special master had not yet completed a review of all "state employment practices." Doc. 6789 at 2. They urged the district court to authorize the special master "to investigate and report on the compliance of all agencies under the jurisdiction of the Governor with the Court's 1972 Decree and supplemental

16

relief orders and *Rutan*." *Id.* at 22.[3] The State moved under Rule 60(b) to vacate the decree, arguing among other things that its terms had been fulfilled and that plaintiffs lacked a concrete stake in the case. Doc. 6946.

The district court denied the State's motion and granted in part and denied in part plaintiffs' motion. SA1. The district court acknowledged this Court's "serious concerns" about plaintiffs' standing, but concluded sua sponte that any justiciability issues could be resolved by "maintain[ing] a laser focus on the First Amendment rights of public employees"—the non-parties whom the court posited were actually affected by the proceedings. SA11. The district court also acknowledged that the decree expressly excludes "hiring" from its ambit, but reasoned that the "monitoring of hiring decisions" was nonetheless required to protect current employees. SA17-18. And the court rejected the State's argument that it had satisfied the decree because there was no evidence of ongoing legal violations, reasoning that there remained a "risk of political decision-making." SA29. The court thus denied the State's motion. SA30-31. And although it denied plaintiffs' motion to expand the special master's role to "actively monitor all State agencies for compliance with every aspect of the Consent Decree," SA38 (emphasis omitted), it nonetheless expanded the special master's role to include duties essentially as broad, tasking the special master with overseeing compliance with the State's own internal hiring policies—most notably its

---

[3] As the district court later observed, SA37, plaintiffs' request for an investigation into the State's compliance with "supplemental relief orders" was erroneous: The State, unlike other *Shakman* defendants, has never been subject to any such orders in this case.

implementation of its "comprehensive employment plan" ("CEP"), which guides all statewide hiring.  SA40.  "[T]he Special Master's continued involvement," the court concluded, "will serve the goals of efficiency and cost-effectiveness."  SA42.

## SUMMARY OF ARGUMENT

The decades-old consent decree at issue here should be vacated for multiple reasons. First, its terms have been satisfied. The decree was entered to remedy a system of coerced political work that the parties agree no longer exists, and its terms reflect that limited purview: They prohibit conduct that affects plaintiffs as voters and candidates (the use of state employees' time and resources for partisan ends) and expressly exclude "hiring"—the current focus of the proceedings below—from the decree. Properly read, there is no evidence that the State has violated the consent decree in decades. But even if the consent decree were read more broadly, the State is in compliance with it. The special master has identified no actual, documented violations of the consent decree, *Rutan*, or any other federal law during her tenure, and the State has expended substantial time and resources establishing institutional reforms that will dramatically reduce the risk of such violations in the future. Given the State's demonstrated progress and the lack of any concrete basis to doubt the State's commitment, there is no need for continued proceedings under the 1972 decree.

Second, equitable considerations independently warrant vacatur. For one, plaintiffs—a former political candidate and voter—lack standing to challenge the State's hiring practices, as this Court squarely held in *Shakman II*. That defect has yielded what even the district court recognized is a "mismatch" between plaintiffs and the proceedings they prosecute: Plaintiffs lack a concrete stake in the human-resources reforms that they are seeking, a result deeply discordant with basic

19

separation-of-powers principles. These proceedings likewise contravene principles of federalism: They have led to the imposition of increasingly intrusive measures on the State's day-to-day employment practices with no discernable tie to violations of federal law.

The district court's contrary conclusion is flawed and should be reversed. First, that court gave the consent decree an expansive reading—reading it not to prohibit the specific conduct that plaintiffs originally challenged but to require reform of the State's "hiring" practices, despite its express exclusion of that subject. At present, hiring is the central focus of the proceedings below—despite the decree's exclusion of that issue and this Court's conclusion that plaintiffs lack standing to challenge it. Second, the district court erred in ruling that the State's institutional reforms were insufficient to warrant termination. The district court reasoned that it would be most "efficient" and "cost-effective" to empower the special master to supervise the State's compliance with its own hiring policies. Without evidence of ongoing violations of federal law or reason to believe that the State will violate federal law absent the consent decree, though, the court's duty was to terminate the decree, not to impose new human-resources rules on the State. Finally, the district court erred in concluding that a "focus" on non-party employees could compensate for plaintiffs' evident lack of Article III standing.

**ARGUMENT**

Rule 60(b) allows a party to vacate a consent decree "'if a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne*, 557 U.S. at 447. The rule "permits relief" on multiple grounds, including that a consent decree "'has been satisfied'" or "'applying it prospectively is no longer equitable.'" *Id.* at 454 (quoting Fed. R. Civ. P. 60(b)(5)). Both criteria are met here. The 1972 consent decree has been "satisfied": No matter how the decree is interpreted, there is no evidence of ongoing violations of federal law, nor any basis to doubt the State's commitment to continued compliance with federal law. And applying the decree prospectively is "no longer equitable," both because plaintiffs lack standing as voters and candidates to police the State's hiring and employment practices and because these proceedings are not reasonably tailored to preventing legal violations. The decision below should be reversed and the decades-old decree vacated.

**I.     The Court Reviews The Denial Of The State's Motion For Abuse Of Discretion, But Reviews Legal Questions De Novo.**

The court reviews the denial of the State's Rule 60(b) motion for abuse of discretion. *Shakman VI*, 994 F.3d at 840. But the court reviews legal questions underlying that determination de novo, *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 911 (7th Cir. 2015), including the proper interpretation of the consent decree, *Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021).

21

## II. The Consent Decree's Purpose Has Been Satisfied.

The State should be released from the consent decree first and foremost because it has been "satisfied." Fed. R. Civ. P. 60(b)(5). A court should vacate a consent decree on this ground if the defendant "is in substantial compliance with the consent decree." *Peery v. City of Miami*, 977 F.3d 1061, 1075 (11th Cir. 2020); *accord Frew v. Janek*, 780 F.3d 320, 330 (5th Cir. 2015); *Jeff D. v. Otter*, 643 F.3d 278, 284 (9th Cir. 2011). Substantial compliance "exists when the consent decree's fundamental purpose has been accomplished, and any deviations from the decree are 'unintentional and so minor or trivial as not substantially to defeat the object which the parties intend[ed] to accomplish.'" *Peery*, 977 F.3d at 1075 (quoting *Jeff D.*, 643 F.3d at 288). A State "cannot be subjected to ongoing classwide structural relief simply because a problem has not been 100% eradicated." *Salazar by Salazar v. District of Columbia*, 896 F.3d 489, 500 (D.C. Cir. 2018).

Here, the State has satisfied the consent decree no matter how the decree is interpreted. If the consent decree is read properly, the State has plainly satisfied it. As this Court has explained, the decree prohibits a system of "coerced political work demanded of those already employed by the government as a condition of continued employment." *Shakman II*, 829 F.2d at 1398. There is no allegation that the State operates such a system today; instead, the proceedings below focus on whether the State has instituted sufficient hiring reforms to guarantee its future compliance with the Supreme Court's decision in *Rutan*—a question outside the decree's scope. But even if the decree encompassed *Rutan* violations, there is no evidence of the kind of

ongoing violations of *Rutan* that would warrant continued supervision by the district court, given the substantial reforms put in place by the State over the past seven years.

### A. The State has complied for decades with the decree's prohibition on coerced political work.

The consent decree has been "satisfied," Fed. R. Civ. P. 60(b)(5), for the basic reason that the State is in compliance with its actual terms. The decree was entered to remedy a specific claim, namely that the State (among other defendants) was operating a system of "coerced political work demanded of those already employed by the government as a condition of continued employment." *Shakman II*, 829 F.2d at 1398. But the current proceedings below concern a different allegation: that the State has not done enough to ensure future compliance with *Rutan*, which prohibits hiring, promoting, and transferring public employees based on political factors. The State is and will remain in compliance with *Rutan*, *infra* pp. 27-33, but even if it were not, the decree is not the proper vehicle for enforcing *Rutan*, because its terms do not encompass such violations. The State should be released from the decree.

A consent decree, as the district court noted, "functions both like a contract and a judgment." SA12; *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 519 (1986). Here, both basic principles of contract interpretation and the claims that the decree actually resolved make clear its limited purview.

Read as a contract between the parties, the decree prohibits the State only from imposing political requirements on current governmental employees—not from

considering political factors in hiring. The "language of [the] [decree]" is the "best indication of the parties' intent," *People's Gas Light & Coke Co. v. Beazer E., Inc.*, 802 F.3d 876, 881 (7th Cir. 2015), and here the decree's plain text does not include a prohibition on the consideration of political factors in hiring decisions.

Paragraphs D and E of the consent decree set out its operative conditions. Paragraph D "declare[s]" the decree's overarching purpose: to "prohibit[]" all "compulsory or coerced political activity by any governmental employee" and to "free" all governmental employees "from all compulsory political requirements in connection with his [or her] employment." A40 (¶D). Paragraph E(2) implements that goal by "enjoin[ing]" defendants from "knowingly causing or permitting any employee to do any partisan political work" while on duty. *Id.* (¶E(2)). And paragraph E(1) bars defendants from "conditioning, basing, or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." *Id.* (¶E(1)). All three provisions thus operate with the same end in mind: resolving plaintiffs' allegations that defendants maintained patronage systems imposing partisan political obligations on public employees as a condition of their continued employment. They say nothing about hiring.

Indeed, if there were any doubt that the consent decree does *not* prohibit defendants from considering political factors in hiring, paragraph H(1)—alongside this case's five-decade history—would resolve it. That paragraph sets out separate "questions" over which the district court would retain jurisdiction, one of which was

whether and to what extent "political sponsorship or other political considerations [can] be taken into account in hiring employees." A40-41 (¶H(1)(b)). Far from encompassing the *Rutan* question, then, the decree expressly excluded it—as evidenced by the years of litigation between plaintiffs and other defendants over that question, *supra* pp. 8-10. "The court's "primary objective in construing a contract is to give effect to the intent of the parties," *People's Gas*, 802 F.3d at 881; here, the decree's terms reflect the parties' intent to *exclude* hiring matters, not to bring them within its scope.

The same conclusion follows from understanding the consent decree as a "judgment[]" entered after the litigation of plaintiffs' claims. *Firefighters*, 478 U.S. at 519. Plaintiffs sued to remedy a specific legal violation: that the State's reliance on a "political patronage system" under which public employees were "required, as a condition of keeping their patronage jobs," to contribute their resources to partisan political organizations violated plaintiffs' constitutional rights as candidates and voters. A7-11 (¶¶20, 27-29). And this Court's 1970 opinion upholding plaintiffs' standing was limited to that asserted violation—namely, that "the operation of the patronage system" disadvantaged "candidates and voters who attempt to use the election process to change the direction of government." *Shakman I*, 435 F.2d at 270. Because the decree was entered to resolve those claims, the "operation of the patronage system" alleged in the complaint, *id.*, is what its provisions should be read to bar.

To read the consent decree more broadly—to include a prohibition on politically-motivated hiring—would upend the basic rule that a plaintiff "must assert his own legal rights and interests," *Warth v. Seldin*, 422 U.S. 490, 499 (1975), not others'. As this Court has held on multiple occasions, plaintiffs lack standing as voters and candidates to challenge the State's hiring, transfer, and promotion practices. *See Shakman II*, 829 F.2d at 1398 (rejecting "plaintiffs' standing to attack the constitutionality of the defendants' hiring practices"); *Rutan v. Republican Party of Ill.*, 868 F.2d 943, 944, 958 (7th Cir. 1989) (en banc) (same for claims challenging "hiring, . . . transferring, and promoting state employees"), *aff'd in part, rev'd in part*, 497 U.S. 62. And for that reason, plaintiffs have amended the complaint several times to add public-employee and applicant plaintiffs with standing to assert hiring- and promotion-based claims against other defendants. *See, e.g.*, *Shakman VI*, 994 F.3d at 840-41 (describing plaintiff who "is a current employee in the Clerk's Office" and so has standing to challenge "municipal hiring practices"). But there were no such plaintiffs in 1972, and there are none today with claims against the State. It is implausible that the State would have agreed to a broad prohibition against considering political factors in hiring absent a plaintiff with any such claim.

Once the consent decree is properly interpreted, it is clear that it has been satisfied. The Supreme Court has explained that a "critical question in th[e] Rule 60(b)(5) inquiry is whether the objective of the" consent decree "has been achieved." *Horne*, 557 U.S. at 450; *see Peery*, 977 F.3d at 1075 ("To evaluate a motion to terminate a consent decree, the . . . court begins 'by determining the basic purpose of

the decree.'"). Here, both the terms of the decree and the nature of the claims it resolved make clear that its objective was to end a system of "coerced political work demanded of those already employed by the government as a condition of continued employment." *Shakman II*, 829 F.2d at 1398. That purpose has been achieved. There is no allegation that the State maintains such a system today, and the focus of the proceedings is instead whether the State is complying with *Rutan*, a question that does not belong in this case. The State should therefore be released from the decree.

None of this is to suggest, of course, that the State may consider political factors in hiring—a practice squarely prohibited by *Rutan*. Indeed, the State emphatically does not consider political factors in filling non-"exempt" positions, and has devoted substantial time and resources instituting reforms to ensuring *Rutan* is followed, *infra* pp. 27-33. Today, however, employees and applicants who believes they have been the subject of discrimination on the basis of their political views have a simple remedy: They may file a lawsuit against the State under *Rutan*. They need not rely on a consent decree entered decades ago to remedy a patronage system long past.

**B.** **No matter how it is interpreted, the consent decree has been satisfied.**

Even if the consent decree could be read more broadly to encompass alleged *Rutan* violations, it has likewise been "satisfied," Fed. R. Civ. P. 60(b)(5), because the State is in compliance with even that broader reading.

As the Supreme Court explained in *Horne*, "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate" federal law.  557 U.S. at 450.  A court considering a motion to terminate a consent decree must therefore "ascertain whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law."  *Id.* at 454; *see Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004) (federal courts should not maintain their "oversight of state programs for long periods of time . . . absent an ongoing violation of federal law"); *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1192-93 (10th Cir. 2018) ("[F]ederal consent decrees are temporary solutions that may be kept in place only as long as necessary to cure an unlawful condition.").  Such violations must be "systemwide," *Lewis v. Casey*, 518 U.S. 343, 359-60 (1996); "[e]xpansive, classwide structural relief that judicially superintends local government operations cannot issue" based only on "one-off errors," *Salazar*, 896 F.3d at 500.  If there are no ongoing, systemic legal violations, and a "durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper."  *Horne*, 557 U.S. at 450.

Many courts of appeals have applied a two-step standard for implementing *Horne*.  These courts ask (1) "whether the state has achieved compliance with the federal-law provisions whose violations the decree sought to remedy," and (2) "whether the State would continue that compliance in the absence of continued judicial supervision."  *John B. v. Emkes*, 710 F.3d 394, 412 (6th Cir. 2013); *accord Peery*, 977 F.3d at 1075 (defendant must show "current substantial, good faith

compliance" and that it is "unlikely . . . [to] return to its former ways absent the consent decree").  That standard is met here.

First, the State's employment practices comply with *Rutan* and its forebears. Plaintiffs resuscitated the consent decree to remedy allegations that the Blagojevich and Quinn Administrations had used "staff assistant" positions at IDOT to reward political allies.  *Supra* pp. 10-12.  But the deficiency that enabled that problem, as plaintiffs and the special master have explained, was the lack of an "exempt list" identifying *Rutan*-exempt positions at agencies across the State—a deficiency that allowed prior administrations to "create and fill an unlimited number of new positions."  Doc. 6306 at 2; *accord* Doc. 4676 at 4 (describing "[t]he lack of a single comprehensive list of Exempt Positions" as the foundation of the IDOT abuses); A144 (calling this defect "the genesis of the Special Master Order").  But after years of sustained effort by the State, the district court approved the State's "exempt list" and its employment plan for exempt hiring in January 2019.  *Supra* p. 15.  The exempt list's completion "will ensure that, going forward, the State fills only truly 'political' or 'policy-making' positions with political appointments."  Doc. 6306 at 4.

The completion of the exempt list and the exempt employment plan (which provides a mechanism for updating that list), and their effective implementation, alongside other reforms, have resolved the original issues that prompted plaintiffs' request for relief in 2014.  The special master's reports acknowledge as much.  The special master's twelve IDOT reports have not identified any ongoing misuse of the IDOT "staff assistant" positions (or any other); rather, they focus on separate

29

human-resources issues, such as IDOT's implementation of "a new electronic hiring/promotion process," Doc. 7368 at 2; the special master's review of "Snowbird hiring paperwork for the 2020-2021 winter season," *id.* at 22; and more. And the special master's four years of work across statewide agencies have revealed no ongoing misuse of exempt positions. Indeed, the special master has been given notice of every single exempt hire made by the State—over 500—since January 2019, and has concluded based on that comprehensive review that the rollout of the list has been a success. Agencies across the State have, as the special master has explained, successfully "utilize[d] the Exempt Employment Plan's hiring process for appointing individuals" into exempt positions, and the special master has, as a result, ceased extensive ongoing oversight of that process, entrusting it instead to HEM. Doc. 6710 at 28. The special master's seven statewide reports today focus on additional human-resources issues (for instance, error messages produced by the State's electronic hiring system, Doc. 7447 at 9), and inadvertent mistakes made by state employees in implementing the State's human-resources policies, principally those reflected in the CEP.

More broadly, today there is no evidence at all of "ongoing violation[s]" of *Rutan* or other federal law, *Horne*, 557 U.S. at 454, and certainly not the kind of "systemwide violation[s]" that could warrant "[s]ystemwide relief," *Lewis*, 518 U.S. at 359. Below, plaintiffs asserted—citing five examples—that the special master has "identified many examples of continuing violations" of federal law. Doc. 7104 at 10. But the cited examples show no such thing, as the State explained, Doc. 7140 at 8-13:

30

Several predate the special master's 2014 appointment, and the rest involve only "report[s]" or "complaints" with no actual evidence of political motivation, Doc. 7104 at 10-11. A State "cannot be subjected to ongoing classwide structural relief" on the basis of isolated, "one-off" violations, *Salazar*, 896 F.3d at 500; it certainly cannot be subjected to such supervision on the basis of "reports" and "complaints." In the end, plaintiffs have tacitly conceded that there is no evidence of ongoing, systemwide violations of *Rutan*, contending only that these data points "show[] that the vestiges of patronage" have not "been eliminated" Doc. 7104 at 11. But the question is not whether the State has adopted every possible measure to eliminate what plaintiffs assert without elaboration are "vestiges" of past violations, or to eliminate the risk of future violations; it is whether there are *currently* "ongoing," "systemwide" violations of federal law. *Lewis*, 518 U.S. at 359; *Horne*, 557 U.S. at 454. There is no evidence that there are.

Second, the State's institutional reforms demonstrate its commitment to ensuring continued compliance with the 1972 decree and *Rutan*. As discussed, *supra* pp. 13-16, the State has invested significant time and resources into reforming and modernizing its employment procedures to prevent the possibility that politics will infect public hiring. It has developed a comprehensive statewide list of all "exempt" positions, built a robust compliance division within OEIG (on which plaintiffs and the special master now heavily rely, *e.g.*, Doc. 7083 at 33-43), and implemented essentially all of the special master's recommendations with respect to exempt hiring (and many of those that go beyond exempt hiring). Even the special master has

repeatedly observed that the State has operated in good faith and that these reforms were an "extraordinary accomplishment" on the State's part. *E.g.*, Doc. 6306 at 4; Doc. 6565 at 1. And the State has committed not only to remaining in compliance with federal law but also to continuing to improve its human-resources practices absent "continued judicial supervision." *John B.*, 710 F.3d at 412; *accord Peery*, 977 F.3d at 1076 (concluding that city's "compliance" would "continue after the termination" of decree given "wide array of programs" established to meet decree's goals).

Below, plaintiffs argued that the State's reforms are insufficiently "durable," Doc. 7104 at 11-26, based largely on the ongoing nature of its implementation of various reforms and the prospect that *Rutan* violations could conceivably occur in the future if those reforms are not carried through. Plaintiffs have argued, for instance, that some state employees are in "temporary" positions, that some hiring occurs on an "emergency" basis, and that the State uses contractors for certain projects rather than hiring full-time employees. *Id.* at 12-16. Plaintiffs assert these practices are "conducive to" *Rutan* violations because they "create opportunities for political influence on employment decisions," and argue that the State must remain under the decree to "reduce the risk of future abuses," *id.* at 12, 16. But plaintiffs have identified no documented violations of federal law relating to the practices they now target, despite seven years of investigation and monitoring by the special master. And the question is not whether the State has completely eliminated the risk of "future abuses," *id.*, but instead whether the decree's continuation is "supported by

an ongoing violation of federal law," *Horne*, 557 U.S. at 454. The answer to that question is no.

In the end, as this Court has explained, "the states . . . have a right to the restoration of control over the institutions of state and local government as soon as the objectives of the federal remedial decree have been achieved." *People Who Care v. Rockford Bd. of Educ., Sch. Dist. 205*, 246 F.3d 1073, 1075 (7th Cir. 2001). Here, no matter how the consent decree is read, those objectives have been met.

## III. Applying The Consent Decree Prospectively Is No Longer Equitable.

The consent decree should be vacated for a second, independent reason: Its continued enforcement against the State is inequitable. As *Horne* explains, relief from a consent decree "may be warranted even if [movants] have not 'satisfied' the original order . . . if prospective enforcement of that order 'is no longer equitable.'" 557 U.S. at 454. Here, continued enforcement of the 1972 decree against the State is not warranted for at least two reasons. First, plaintiffs—a former political candidate and his supporter—lack standing to supervise the State's compliance with *Rutan* and, more broadly, its statewide human-resources operations. Second, the proceedings below are not reasonably tethered to any actual legal violations, and so offend basic principles of federalism. These factors require the State's release from the consent decree, and at minimum exacerbate the legal flaws associated with these proceedings.

**A.** **Plaintiffs lack standing to superintend the State's compliance with *Rutan*.**

Article III of the Constitution permits federal courts to "adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). "The doctrine of standing exists to enforce this limitation and requires 'that any person invoking the power of a federal court must demonstrate standing to do so'"—namely, by showing that he or she "has suffered an injury in fact fairly traceable to the defendant that is capable of being redressed through a favorable judicial ruling." *J.B. v. Woodard*, 997 F.3d 714, 720 (7th Cir. 2021). This ensures that "a case embody a genuine, live dispute between adverse parties." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). "[N]o principle is more fundamental to the judiciary's proper role in our system of government." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 341 (2006).

These principles apply differently in the Rule 60(b) context, but are no less important. Although a lack of Article III standing is not necessarily a jurisdictional defect, given the existence of the consent decree, a lack of standing on the part of the decree's enforcers may nonetheless provide an equitable reason for a court to decline to enforce it (or, here, to dissolve it). *Shakman III*, 396 F.3d at 868. Indeed, this Court has explained in the context of this case that a court considering a Rule 60(b) motion to dissolve the decree must ask "whether the plaintiffs . . . bring to the litigation the sort of concrete adverseness" necessary "to fulfill the mandate" of the Supreme Court's precedents on Article III standing. *Id*. Specifically, the court must "be guided by the current law of standing to determine whether" plaintiffs have "the

necessary interest in this litigation to vigorously litigate and present the matter of political patronage to the court in the manner best suited for judicial resolution, or whether that task is best left to individuals directly impacted" by hiring decisions. *Shakman IV*, 426 F.3d at 936 (internal quotation marks and alterations omitted).

Under bedrock principles, plaintiffs lack Article III standing to maintain *Rutan* claims against the State, and that defect warrants the decree's termination. Plaintiffs are not state employees or applicants for state employment. Shakman ran as an independent candidate in a political race in 1969, and Lurie supported him. They argued that defendants' operation of a patronage scheme requiring public employees "to furnish votes, campaign work, and money to elect candidates" of the incumbent party "prevent[ed] the election of other candidates." *Shakman I*, 435 F.2d at 268. This Court held, in a divided opinion and without meaningful analysis, that they had standing—stating that, "assuming" plaintiffs' rights had been violated, "their standing to bring" suit was "apparent." *Id.* at 269.

As this Court observed in *Shakman II*, subsequent developments in the law of Article III standing have severely undermined *Shakman I*. *Shakman I* predated the limitations subsequently imposed on Article III standing by the Supreme Court, specifically its development of principles of causation and redressability. *Shakman II*, 829 F.2d at 1393-94. Today, a court must confirm that the plaintiff's asserted injury is "the consequence of the defendants' actions, [and] that prospective relief will remove the harm." *Id.* But *Shakman I* did not consider whether plaintiffs' asserted injury—the diminution of their "voice[s]" as candidates and voters, 435 F.2d

at 270—in fact resulted from defendants' alleged conduct, and that omission prompted this Court in *Shakman II* to limit *Shakman I* to its facts, explaining that it could not "regard" that opinion "as having the precedential effect that [it] would normally accord such an earlier ruling of th[e] court," 829 F.3d at 1393. Other opinions have likewise expressed "serious reservations as to the correctness" of *Shakman I*. *Id.* at 1398 n.11; *accord Plotkin v. Ryan*, 1999 WL 965718, at *3 (N.D. Ill. Sept. 29, 1999) (explaining that "later decisions . . . cast considerable doubt as to the continuing validity of the *Shakman I* reasoning"), *aff'd*, 239 F.3d 882 (7th Cir. 2001).

This Court has no need to revisit *Shakman I* here, however, because its subsequent *Shakman* opinions make clear that, whatever that opinion's vitality as applied to the specific patronage scheme alleged in 1969, it cannot be extended to these proceedings, in which plaintiffs seek primarily to superintend the State's compliance with *Rutan*. Indeed, this Court held essentially that in *Shakman II*, explaining that plaintiffs lacked standing to challenge Chicago's practice of considering partisan affiliation in hiring public employees. As this Court observed, "the line of causation between" that practice and plaintiffs' asserted injuries as political candidates and voters was too "attenuated" to ground Article III standing. *Shakman II*, 829 F.2d at 1389-90, 1397. The Court reached the same conclusion in its en banc decision in *Rutan*, holding that the voter plaintiffs there lacked standing to challenge the State's "use of political considerations in hiring, . . . transferring,

36

and promoting employees." 868 F.2d at 944. These cases establish that plaintiffs cannot maintain *Rutan* claims against the State.[4]

It is thus apparent that plaintiffs do not have standing to challenge the State's consideration of political factors in hiring, transferring, and promoting public employees—the focus of the proceedings below. That defect raises serious legal and equitable concerns, calling into question whether plaintiffs "bring to the litigation the sort of concrete adverseness" necessary to ensure proper resolution of this matter. *Shakman III*, 396 F.3d at 868. Here, to ask that question is to answer it. Plaintiffs are attorneys in private practice who are not personally affected in any way by the proceedings below. Rather, plaintiffs' only interest in this case is their asserted interest in good governance—an interest shared by every Illinois resident. Absent a "concrete stake in the outcome" of this case, *id.*, their enforcement of the consent decree is discordant with "fundamental" limits on federal courts' power, *Cuno*, 547 U.S. at 341.

Plaintiffs' lack of any concrete stake in these proceedings thus makes the prospective application of the consent decree at their request "no longer equitable." Fed. R. Civ. P. 60(b)(5). The Supreme Court has emphasized that federal courts may

---

[4] That result is consistent with this Court's recent opinion in *Shakman VI*, 994 F.3d 832. That appeal concerned the Cook County Clerk, an entity subject both to the 1972 consent decree and a subsequent decree entered in 1991 that "enjoined city and county officials from conditioning hiring or promotions on . . . political affiliation," *id.* at 836. The Clerk did not ask the court to revisit *Shakman I, id.* at 840, because the district court identified only violations of the 1991 decree—which, in turn, was entered after the addition of public-employee plaintiffs. Here, the only plaintiffs are "candidates and voters," *id.*, without standing to bring hiring claims.

37

not be used "as a forum in which to air . . . generalized grievances about the conduct of government." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 483 (1982). Unmoored from the interests of any individual actually injured by the State's alleged *Rutan* violations, however, this case has become just that: a forum for two people, purporting to stand for a class of millions of Illinois voters and political candidates, to raise "generalized grievances" about state hiring. But the task of protecting employees' constitutional rights can now be "left to individuals directly impacted"—the employees themselves. *Shakman IV*, 426 F.3d at 936. Plaintiffs' advisory role in these proceedings—deeply discordant with modern standing doctrine—is no longer needed.

**B.** **The proceedings below offend principles of federalism and are not reasonably tailored to any identified legal violation.**

Finally, the consent decree should be vacated because the proceedings below offend bedrock federalism principles. The Supreme Court has repeatedly cautioned that institutional reform decrees "raise sensitive federalism concerns," especially in "areas of core state responsibility." *Horne*, 557 U.S. at 448. Federal courts "must take into account the interests of state and local authorities in managing their own affairs." *Milliken v. Bradley*, 433 U.S. 267, 280-281 (1977). A federal court should not continue its "oversight of state programs for long periods of time . . . absent an ongoing violation of federal law," and must ultimately ensure that "responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Frew*, 540 U.S. at 441-442. Earlier this year, this Court expressed "grave federalism concerns" with the "static and permanent" nature of these proceedings. *Shakman*

*VI*, 994 F.3d at 843. "[F]ederal courts," the court explained, "are not here to oversee and monitor the hiring practices of municipal government for decades on end." *Id.*

But that is just what is occurring here. Over the course of the last eighteen months, the proceedings below have focused on increasingly minute facets of the State's employment practices—aspects of the State's hiring systems and processes that have not actually led to violations of federal law but that plaintiffs posit could be improved. In the name of leaving no stone unturned to prevent possible *Rutan* violations, plaintiffs have thus proposed a range of increasingly intrusive measures that have only a conjectural connection with violations of federal law. The district court, in turn, has expanded the scope of these proceedings, and the special master's authority, not based on any documented violation of federal law, but on the premise that doing so provides "'the most efficient and cost-effective' approach" to improving state policies. SA36. That approach contravenes basic federalism principles.

The central focus of the proceedings below demonstrates that this case has transformed into a vehicle for plaintiffs to suggest possible improvements to the State's employment policies. In particular, the current proceedings focus on the refinement and implementation of the State's comprehensive employment plan and electronic hiring system. Doc. 7452 at 2-4; Doc. 7452-1 at 3-10. But the adoption of these measures is not required by federal law, nor have plaintiffs introduced any evidence that their adoption is needed to "eliminat[e] a condition that . . . violate[s] federal law" or that "flow[s] from such a violation." *Horne*, 557 U.S. at 450 (brackets omitted). They certainly have not identified any evidence that the specific terms that

39

they have asserted must be included in the State's plan—for instance, a rule that interviewers trained in *Rutan* compliance "score" job candidates independently, without consulting with each other; a rule that the State provide advance notice to OEIG before its employees discuss the results of any job interview; and the like, Doc. 7104 at 24-25—are needed to eliminate a violation of federal law. Plaintiffs' and the special master's preferred rules might be (in the district court's words) "best-human-resources practices." SA29. Or they might not be. Absent evidence that any is necessary to prevent a violation of federal law, though, the selection of which human-resources practices to adopt should be a determination for the State to make.

Plaintiffs have likewise taken the position that the following specific steps, among others, are necessary for the State to exit the consent decree:

- The full implementation of an electronic hiring system for all statewide hiring (a process the State has explained will take years to achieve), Doc. 7452-1 at 5;

- An "update" of the "position descriptions" for all 50,000 jobs statewide under the Governor's purview, including a full review of the "minimum qualifications" identified for each job (a project that could likewise take years), *id.* at 6;

- A change to "restrictive [collective bargaining agreement] provisions" that affect how the State considers union members in hiring decisions (i.e., the renegotiation of provisions of the State's collective bargaining agreement

40

with its unionized workforce—provisions that *actual* state employees have bargained and voted for), *id.* at 7-8;

- The creation of a new "independent compliance monitoring function" not subject to the same statutory confidentiality limitations as OEIG (i.e., the stand-up of a new state agency), Doc. 7455 at 17-18; and

- A review window of at least six additional months for the special master after the completion of these other steps, Doc. 7452-1 at 9.

Setting aside the fact that many of the steps plaintiffs propose would be years-long undertakings, plaintiffs identify no reason why any (much less all) of them will eliminate a condition that violates federal law, *see Horne*, 557 U.S. at 450. And plaintiffs have now also suggested that vacatur of the consent decree should be conditioned not on the State's substantial compliance with the decree itself, but on the State's substantial compliance with the internal policies and procedures set out in the CEP—which plaintiffs say will be demonstrated, in part, by state employees' implementation of the CEP's formal hiring protocols in "all or substantially all" of the hiring decisions that the special master observes. Doc. 7481 at 3, 14. That the future of this case, in plaintiffs' view, should turn on the State's compliance with details of hiring policies the State has voluntarily adopted—policies that go beyond what is required by "reasonable and necessary implementation[] of federal law," *Horne*, 557 U.S. at 450—invades upon the "substantial discretion," *Frew*, 540 U.S. at 442, that the State retains in setting its hiring policies. *Accord Evans v. City of Chicago*, 10 F.3d 474, 479 (7th Cir. 1993) (en banc) (opinion of Easterbrook, J.)

("[C]ourts are bound by principles of federalism . . . to preserve the maximum leeway for democratic governance.").

In the end, after the "half century" that this case has "remained a fixture on the federal docket," *Shakman IV*, 994 F.3d at 843, plaintiffs have reoriented the proceedings below around the implementation of "best-human-resources practices," SA29, rather than the remediation of legal violations. In plaintiffs' view, the State's adoption of these practices will guard against the risk that its employees will violate *Rutan* in the future. *See* Doc. 7104 at 12 (describing these as "practices conducive to [*Rutan*] violations"). But "federal consent decrees are temporary solutions," not permanent risk-mitigation measures; they "may be kept in place only as long as necessary to cure an unlawful condition." *Jackson*, 880 F.3d at 1192. "Future failures to comply with federal law may well result in future lawsuits against the State," but it is inconsistent with basic separation-of-powers principles for the court "to maintain oversight" over the State's hiring policies "merely out of fear that [it] may not continue to remain in compliance." *John B. v. Emkes*, 852 F. Supp. 2d 957, 983 (M.D. Tenn. 2012), *aff'd*, 710 F.3d 394. The consent decree should be vacated.

## IV. The District Court Erred In Denying The State's Motion To Vacate The Consent Decree.

The district court acknowledged both the "significant progress" the State has made and the "mismatch" between the plaintiffs' original claims and the focus of the present proceedings, SA15, 30, but nonetheless denied the State's motion to vacate. Its decision is flawed on multiple grounds. First, the district court gave the consent decree an improbably broad interpretation, effectively reading key limitations out of

its text.  Second, it failed to ask whether continued proceedings are warranted by ongoing violations of federal law, and erred in concluding that the State has not implemented a durable remedy.  Finally, the court failed to ask whether the plaintiffs' evident lack of Article III standing alone warrants the termination of the consent decree, especially given the intrusive nature of the current proceedings.

### A. The district court erred in misreading the consent decree to encompass *Rutan* violations.

First, the district court misread the consent decree to encompass not only a prohibition on imposing political "condition[s]" on current employees, but also a prohibition on hiring based on political considerations—notwithstanding the decree's reservation of that question.  SA12-20; A40-41 (¶¶E(1), H(1)(b)).  The court reviews the interpretation of a consent decree de novo.  *Holmes*, 991 F.3d at 780.

As explained, *supra* pp. 23-27, the consent decree prohibits the State only from imposing political requirements on current governmental employees, not from considering political factors in making hiring decisions.  That is so whether the decree is read as a contract between the parties or as a judgment arising from plaintiffs' claims.  The decree prohibits the State from requiring employees to perform political work, A40 (¶E(2)), but it reserves the question whether "political sponsorship or other political considerations [could] be taken into account in hiring employees," A40-41 (¶H(1)(b)).  And that limitation fits the claims plaintiffs actually brought in 1969, which arose from the State's alleged operation of a patronage system that required its employees to contribute resources to the incumbent party.

The district court rejected that reading of the consent decree. SA12-20. It acknowledged that the decree, by its terms, applies only to "persons who are already State employees" and does not, by its terms, encompass "hiring." SA17-18. The court nonetheless reasoned that the decree "can require some level of monitoring hiring decisions," SA18, and on that basis rejected the State's motion to vacate to the extent it challenged the proceedings as outside the scope of the decree. The district court's reasoning is flawed in multiple respects.

The court's opinion is based on its view that paragraph E(1) of the consent decree reaches beyond a ban "on coerced political work" by providing that no "'term or aspect' of employment . . . can be prejudiced by 'any political reason or factor.'" SA12-13 (quoting A40 (¶E(1))). At the outset, the district court erred in reading paragraph E(1) as an all-encompassing bar on the consideration of political factors in public employment. "The primary objective in construing a contract is to give effect to the intent of the parties." *Minnesota Life Ins. Co. v. Kagan*, 724 F.3d 843, 849 (7th Cir. 2013). And "because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Id.* (emphasis omitted). Here, these rules required the district court to consider paragraph E(1) in context—that is, in light of plaintiffs' claims (which challenged the operation of a system of coerced political contributions) and neighboring provisions of the decree (which prohibit the continued operation of that system, A40 (¶¶D, E(2))). In context, paragraph E(1) complements paragraphs D and E(2) by ensuring that the defendants did not impose political "condition[s]" on public

44

employees that fell outside the actual terms of paragraph E(2) but were nonetheless coercive—such as a requirement that current employees vote or make campaign contributions for incumbent-party candidates, *see* A11 (¶29). Read this way, paragraph E(1) does not generally bar the consideration of political factors in public employment; it just reinforces the specific remedies set out elsewhere in the consent decree—remedies meant to eliminate a patronage system that concededly no longer exists.

But even if the district court were correct that paragraph E(1) expanded the consent decree's scope beyond the political patronage system that was the center of the 1969 complaint, it would still have erred in construing the decree to reach hiring decisions. As the district court acknowledged, A17-18, the consent decree expressly reserved the question whether "political sponsorship or other political considerations [could] be taken into account in hiring employees," A41 (¶H(1)(b)), meaning that the decree plainly does not prohibit the State from doing so. But the district court reasoned that paragraph E(1) "can require some level of monitoring hiring decisions" because (a) the State's consideration of political factors in hiring decisions affects current employees who applied for the job in question; (b) political hiring "would likely be significant circumstantial evidence that partisanship is infecting *other* employment decisions"; and (c) those hired for political reasons might later be

transferred to other jobs, a decision which would "prejudic[e] or affect[]" current employees who sought those jobs, A40 (¶E(1)). SA18-19.[5]

The district court's reasoning is flawed on multiple levels. For one, the court operated from the premise that paragraph E(1)'s expansive language should be read to take priority over the specific exclusion of "hiring employees" from the consent decree—such that *any* hiring on the basis of political considerations falls within its scope as long as it could be viewed to "affect[] any term or aspect of governmental employment[] with respect to" current employees. A40-41 (¶¶E(1), H(1)(b)). But it is a basic rule of contract construction that the specific controls the general, *Bank of Com. v. Hoffman*, 829 F.3d 542, 548 (7th Cir. 2016), and here the district court gave no reason why the decree's specific exclusion of hiring should not control paragraph E(1)'s general prohibition, or why paragraph E(1) should not be "interpret[ed] . . . in light of" paragraph H(1)(b), *id.*

More fundamentally, though, the district court effectively read the exclusion of "hiring" matters, A41 (¶H(1)(b)), out of the consent decree entirely. The district court acknowledged this provision, observing that the decree and *Rutan* "are not co-extensive" and stating that it would "apply the textual limit[s]" imposed by the decree. SA17, 20. But the three exceptions the district court identified swallow those limits whole. Under the district court's reading of the decree, it is appropriate to

---

[5] The district court also suggested that hiring matters are "arguably" within the scope of the consent decree's "reserved jurisdictional provisions." SA19-20. But the parties retained jurisdiction only to "continue to litigate" the hiring question. A41 (¶H(1)(b)). These provisions thus show that the hiring question was excluded from the consent decree, not that it was included.

exercise supervision of *all* hiring into state positions because such hiring may affect current employees or may provide "circumstantial evidence" of partisanship infecting non-hiring matters. SA18-19. Indeed, despite acknowledging limitations on the decree's scope, the district court proceeded to impose *no* limits in shaping the subsequent proceedings; among other things, it expanded the special master's remit to monitor the State's implementation of the CEP—the overwhelming focus of which is hiring. SA42-43.[6] The court's failure to enforce the decree's exclusion of hiring likewise belies the decades-long history of the case, during which plaintiffs litigated the hiring question to judgment, lost an appeal on the ground that they lacked standing to challenge hiring practices, and added new plaintiffs to remedy that very defect. *Supra* pp. 8-9. On the district court's reading of the consent decree, none of these proceedings were necessary, because the decree already encompassed the very rule plaintiffs sought to add. That cannot be right.

The ultimate effect of the district court's reading is that every aspect of the State's hiring is today covered by a decree that expressly excludes "hiring"—which in turn is enforced by plaintiffs who lack standing to challenge hiring practices. That error alone requires reversal.

---

[6] Similarly, the district court authorized the special master to oversee the State's implementation of the CEP on a statewide basis, notwithstanding that the decree is expressly limited to matters occurring "in the Northern District of Illinois." A42.

**B.    The district court erred in concluding that the State has not implemented a durable remedy.**

The district court likewise erred in concluding that the State has not satisfied the consent decree, however it is read.  SA20-31.  The district court credited the State for making "significant progress . . . toward implementing a durable remedy," but nonetheless concluded that "now is not the right time to terminate the Consent Decree."  SA30.  But the district court failed to correctly apply the *Horne* standard for termination of a consent decree—a legal error that this Court reviews de novo, *Philos Techs.*, 802 F.3d at 911—and thus erred in denying the State's motion.

The district court's analysis should have begun with the standard set out in *Horne*.  There, the Court explained that, because "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law," a court considering a Rule 60(b) motion must first "ascertain whether ongoing enforcement" is "supported by an ongoing violation of federal law."  557 U.S. at 450, 454 (brackets omitted).  If there is no "ongoing" legal violation—i.e., the "objective" of the consent decree "has been achieved"—and a "durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper."  *Id.* at 450.  Courts implementing *Horne* have read it to contemplate an inquiry into "whether the State would continue [its] compliance in the absence of judicial supervision."  *John B.*, 710 F.3d at 412; *see also Peery*, 977 F.3d at 1075; *Jackson*, 880 F.3d at 1202-03.  But the district court departed from *Horne* in numerous respects.

First, the district court failed to "ascertain whether ongoing enforcement of the [decree] was supported by an ongoing violation of federal law," as *Horne* directs. 557 U.S. at 454. The district court acknowledged the State's argument that neither plaintiffs nor the special master have identified one documented *Rutan* violation over the last seven years, much less the kind of "systemwide violation[s]" that could warrant "[s]ystemwide relief," *Lewis*, 518 U.S. at 359; *see Salazar*, 896 F.3d at 300, but rejected it on two grounds: (a) that the State bore the burden to "produce evidence" of a *lack* of "illegal political discrimination"; and (b) that, although the special master had not found evidence of *Rutan* violations, she had "highlighted areas of ongoing concern," some of which *could* have yielded *Rutan* violations. SA25-26.

Neither of these bases can sustain the district court's decision. Although the State bears the burden of establishing that "changed circumstances warrant relief," *Horne*, 557 U.S. at 447, the district court identified no authority requiring the State to prove a negative, nor would such a requirement make sense here. The special master was appointed to determine whether legal violations are occurring: She was originally tasked with "investigat[ing] the scope and reasons for any violations of the 1972 Decree regarding IDOT," A139, and the scope of her statewide authority encompasses (in plaintiffs' own words) "investigating violations of the 1972 Decree" statewide, Doc. 6954 at 3; *accord* Doc. 6720 at 2 (special master's filing). The special master's failure to identify a single documented *Rutan* violation during that time constitutes prima facie evidence that such violations are not "ongoing," *Horne*, 557 U.S. at 454; *cf. People Who Care*, 246 F.3d at 1078 (terminating decree where,

49

"[p]ressed at argument, the plaintiffs' able lawyer could not cite an instance in which the school board has violated . . . the decree").

More fundamentally, the district court erred in reasoning that a consent decree can be sustained on the basis of "concern[s]" and "inferences." SA26-31. The Supreme Court has explained that federal courts should not exercise "oversight of state programs for long periods of time . . . absent an ongoing violation of federal law," *Frew*, 540 U.S. at 441, and the district court essentially conceded it had no evidence before it of such a violation, SA27-28, making termination appropriate. The "areas of ongoing concern" that it identified, SA26, are no substitute. One case identified as supporting an "inference" of a *Rutan* violation, for instance, involved a single agency "circumvent[ing] the competitive hiring process to favor a pre-selected candidate" on a single occasion. *Id.* But there was no "direct evidence of political motivation" in this case (nor, for that matter, *indirect* evidence of such motivation), as the district court conceded, SA27, only evidence of failure to follow procedures. The same is true for the second example identified by the district court, SA28-29, which occurred over five years ago and was not supported by actual evidence of political motivation. A consent decree subjecting the State to federal oversight in all aspects of statewide employment should not be sustained on such slender reeds.

The remaining "area[s] of concern" identified by the district court, SA26-30, likewise should not be used to extend the consent decree. As the court recognized, these practices—identified by plaintiffs as grounds to continue the decree—have not led to any identified *Rutan* violations, but rather *could*, if misused, "allow political

considerations to affect current State employees." SA30.  But the question is not whether the special master, plaintiffs, or the court itself could identify prophylactic measures that might reduce the risk of future violations of federal law; it is whether there are *currently* "ongoing," "systemwide" legal violations that warrant statewide intervention of the kind currently in place.  *See Lewis*, 518 U.S. at 359; *Horne*, 557 U.S. at 454.  The district court identified no evidence that such violations are occurring.

The district court also failed to heed *Horne*'s admonition that if a "durable remedy has been implemented, continued enforcement of the [consent decree] is not only unnecessary, but improper."  557 U.S. at 450.  Those courts that have applied *Horne* have concluded that this standard turns on whether "the State would continue [its] compliance in the absence of judicial supervision."  *John B.*, 710 F.3d at 412; *see supra* p. 28.  But the district court did not conduct such an analysis or even explain what it thought *would* constitute a "durable remedy."  Instead, it simply posited that additional time was warranted to allow the special master to "draw[] conclusions about the . . . 'overall impact'" of the reforms implemented by the State to date, including the adoption of the exempt list, the creation of HEM, and the CEP's implementation.  SA20-25, 40-42.

But that approach finds no support in *Horne* or cases implementing it and is inconsistent with federalism principles.  The district court appeared to suggest that a "durable remedy" is one that fully ameliorates the risk of future legal violations.  *See* SA30 (reasoning that it "is not easy to durably protect State employees from partisan

decision-making in employment"). But there is no indication that the Supreme Court meant to impose such a requirement in *Horne*, and courts have not understood *Horne* that way. The Tenth Circuit, for instance, has "interpret[ed] the Court's reference to a 'durable remedy'" merely to reflect the principle "that fleeting . . . compliance is insufficient to warrant relief." *Jackson*, 880 F.3d at 1202. But the State is not in "fleeting" compliance with federal law; rather, the special master has identified no documented violations in years. Nor did the district court identify any reason to believe that the State will fall out of compliance in the future absent "continued judicial supervision." *John B.*, 710 F.3d at 412-13. It simply reasoned that the State's reforms, although substantial, had not yet progressed far enough to be "durable." That is not *Horne*'s standard.

Because the "objects of the decree have been attained" and the State will remain in compliance absent continued oversight, the district court should have returned "responsibility for discharging the State's obligations . . . to the State and its officials." *Frew*, 540 U.S. at 442. It erred in imposing obligations on the State that exceed these principles.

### C. The district court erred in permitting these proceedings to continue absent plaintiffs with Article III standing.

Finally, the district court erred in permitting these proceedings to continue absent plaintiffs with Article III standing. This Court has held that a court considering a Rule 60(b)(5) motion in this case "must" determine whether, as an equitable matter, plaintiffs retain "the necessary interest . . . to vigorously litigate and present the matter of political patronage to the court in the manner best suited

for judicial resolution, or whether that task is best left to individuals directly impacted by hiring decisions made by" the defendant. *Shakman IV*, 426 F.3d at 936 (internal quotation marks and brackets omitted). Here, the court's prior opinions make clear that plaintiffs lack standing to bring *Rutan* claims against the State, and that defect warrants termination. *Supra* pp. 34-38.

Notwithstanding this Court's direction, the district court failed to conduct a meaningful inquiry into whether it remained equitable to enforce the decree against the State absent plaintiffs with Article III standing. SA8-11. The court noted the "serious concerns" that this Court has expressed regarding plaintiffs' standing, SA10, and what it described as a "mismatch" between plaintiffs' own interests and the interests of the public employees who are actually affected by these proceedings, SA15. But the court conducted essentially no inquiry into whether plaintiffs have standing under "the current law of standing," *Shakman IV*, 426 F.3d at 936, or whether any standing defect warranted termination as an equitable matter. Instead, the district court appeared to reason that any standing defect on plaintiffs' part could be cured by "maintain[ing] a laser focus on the First Amendment rights of public *employees*"—the protection of which, the court explained, was "the crucial purpose of the Consent Decree." SA11. In its view, in other words, the fact that plaintiffs themselves might lack standing (and so might lack "the necessary interest in this litigation" to ensure adversity, *Shakman IV*, 426 F.3d at 936) could be cured by the district court's own mental substitution of the proper plaintiffs—state employees— for the actual plaintiffs.

Such an approach finds no support in this Court's precedents. For one, the "protection of First Amendment rights of public *employees*" has never been the "purpose of the Consent Decree," SA11—at least not as applied to the State—for the basic reason that no public employees have ever asserted claims against the State in this case. A plaintiff "must assert his own legal rights and interests," *Warth*, 422 U.S. at 499, and so the focus of these proceedings must be the actual plaintiffs' interests, not the interests of hypothetical public-employee plaintiffs. But here plaintiffs have no "concrete interest," *Shakman IV*, 426 F.3d at 936, in these proceedings, *see supra* pp. 34-38. That should have prompted the district court to terminate the consent decree, not to speculate as to what might be in the interest of parties not before the court. Indeed, the district court's hypothetical-plaintiff approach cannot be reconciled with the "fundamental" principle that federal courts may decide only "controvers[ies] between parties," not abstract questions of law. *Cuno*, 547 U.S. at 341. The court's attempt to solve the standing problem wholly disregarded that basic principle.

In the end, the district court's failure to seriously inquire into the equity of enforcing the consent decree against the State absent the participation of plaintiffs with Article III standing leaves the proceedings below adrift. Plaintiffs continue to urge the district court to condition the vacatur of the consent decree on the State's adoption of additional "best-human-resources practices," SA29, that have no impact on them and bear no discernable connection to violations of federal law. It is past

time to "return[]" the "responsibility for discharging the State's obligations . . . to

the State and its officials," *Frew*, 540 U.S. at 442, and terminate the decree.

## CONCLUSION

For these reasons, this Court should reverse the district court's order declining to dissolve the 1972 consent decree.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

/s/ Alex Hemmer
**ALEX HEMMER**
Deputy Solicitor General
100 West Randolph Street
Chicago, Illinois 60601
(312) 725-3834
ahemmer@atg.state.il.us

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendant-Appellant

July 7, 2021

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(A) and Circuit Rule 32(c) because it contains 13,874 words (excluding the parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)).  This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(a) because it has been prepared in a proportionally spaced typeface (12-point Century Schoolbook BT) using Microsoft Word.

/s/ Alex Hemmer
ALEX HEMMER

July 7, 2021

# CERTIFICATE OF RULE 30 COMPLIANCE

In accordance with this Court's Rule 30(d), I certify that all materials required by this Court's Rules 30(a) and (b) are included in the short appendix to the brief and the separate appendix.

/s/ Alex Hemmer
ALEX HEMMER

July 8, 2021

**REDACTED SHORT APPENDIX**

**TABLE OF CONTENTS**

Page

Memorandum Opinion and Order
  March 31, 2021 (Doc. 7370) ................................................................ SA1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL SHAKMAN, *et al.*      )
                                  )
        Plaintiffs,        )      No. 1:69-CV-02145
                                    )
      v.                 )
                                    )      Judge Edmond E. Chang
OFFICE OF THE GOVERNOR OF THE    )
STATE OF ILLINOIS, *et al.*       )
                                  )
        Defendants.      )

**MEMORANDUM OPINION AND ORDER**

In this long-running case, the Governor of Illinois[1] seeks to exit its decades-long obligations under a Consent Decree entered in 1972. To that end, the State has moved to vacate the Consent Decree, which enjoins the State from engaging in certain politically motivated employment practices. R. 6946.[2] In contrast, the Plaintiffs have moved to expand the Consent Decree, or in the alternative, to clarify the mandate of the Court-appointed Special Master, whose authority is delineated by orders entered in 2014 and 2017. R. 6789. In response, the State has filed a cross-motion to vacate those orders and discharge the Special Master. R. 6947. For the reasons explained in this Opinion, the State's motion to vacate and the cross-motion to discharge are denied. The Plaintiffs' motion is denied in part and granted in part.

---

[1]In this Opinion "the Governor" refers to the Office of the Governor and not any particular administration.

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

**SA1**

# I. Background

In 1969, Michael Shakman, a candidate in an Illinois election, as well as one of his supporters, alleged that State and local government employment practices stood in the way of the Plaintiffs' right to participate fairly in the electoral process. *Shakman v. Democratic Org. of Cook Cty.,* 481 F. Supp. 1315, 1320 (N.D. Ill. 1979), *vacated and remanded sub nom. Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987). The Plaintiffs' theory was that political patronage in State and local government agencies coerced political support from government employees, and thereby violated the rights of voters and candidates. *Id.* at 1320–21. The patronage system required some government employees, as a condition for obtaining and keeping their jobs, to secure political sponsorship of an individual with a party connection. R. 277-2, First. Am. Compl ¶¶ 24–26. And obtaining a sponsorship required, not surprisingly, political contributions or performing political work for the party or a candidate. *Id.* ¶ 29.

In 1972, the parties entered into a Consent Decree, which set forth both injunctive-relief and jurisdiction-retention provisions. Under the provisions for injunctive relief, various government entities, including the Office of the Governor, were permanently enjoined from:

> (1) conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor.

> (2) knowingly causing or permitting any employee to do any partisan political work during the regular working hours of his or her governmental employment, or during time paid for by public funds […]

2

**SA2**

(3) knowingly inducing, aiding, abetting, participating in, cooperating with or encouraging the commission of any act which is proscribed by this paragraph E, or threatening to commit any such act.

R. 6946-1, Exh. A, Consent Decree ¶¶ E(1)–(3). Under its jurisdictional provisions, the Consent Decree "enable[d] the parties to this Judgment to continue to litigate the following questions before this court":

(a) Certain governmental employment positions under the jurisdiction of the defendants who are parties to this Judgment by their nature involve policy-making to such a degree or are so confidential in nature as to require that discharge from such positions be exempt from inquiry under this Judgment. Jurisdiction is maintained to litigate the question of which governmental employment positions under such defendants' jurisdiction are so exempt for the foregoing reasons.

(b) Can political sponsorship or other political considerations be taken into account in hiring employees? If so, to what extent can such considerations be taken into account?

(c) What remedies and implementing procedures ought to be granted and established by the Court in connection with the resolution of the questions raised in the foregoing subparagraphs (a) and (b)?

*Id.* ¶ H(1)(a)–(c). Over the years, other government entities have agreed to supplemental relief orders, *see, e.g.*, R. 531, but the Governor is not subject to any other orders.

Fast forward to 2014. In April of that year, the Plaintiffs sought supplemental relief, alleging that the Illinois Department of Transportation (IDOT) was filling *faux*-exempt[3] "Staff Assistant" positions based on political considerations. R. 3744 at

---

[3]Exempt positions are those for which political affiliation is an appropriate consideration because the positions involve policymaking or some other compelling interest. Non-exempt or "covered" positions are those for which political affiliation is not an appropriate consideration. *See Elrod v. Burns*, 427 U.S. 347, 367 (1976); *Branti v. Finkel*, 445 U.S. 507, 518 (1980).

3

**SA3**

7. According to the Plaintiffs, these practices began under Governor Blagojevich and continued under Governor Quinn. *Id.* at 6. In August 2014, the Executive Ethics Commission published a report of the Office of the Executive Inspector General (OEIG), which was based on a multi-year investigation into hiring practices at IDOT. *See* 3944 at 7–8. Applying a "reasonable cause" standard, the OEIG concluded that IDOT had approved the hiring of persons into the nominally exempt Staff Assistant positions to perform non-exempt work, and then transferred some of those employees to other non-exempt positions—all without following the *Rutan*[4] hiring process. R. 3944-2 at iii-iv; R. 3944-4 at 181. A number of these Staff Assistants conceded that they were hired because of some sort of political affiliation. R. 3944-4 at 197–98. In November 2014, the previously assigned judge relied on the OEIG's findings to appoint a Special Master to investigate IDOT's Staff Assistant hiring practices. R. 4020 ¶ 3; R. 6946-2 at 12:25–14:7.

In 2016, the Plaintiffs moved to expand the scope of the Special Master's responsibilities to include a review of exempt employment at *all* agencies under the Governor's jurisdiction. R. 4676 at 1–2. In May 2017, the Court expanded the Special Master's authority to include development of a comprehensive statewide list of exempt positions. *See* R. 4798 at 6–7; R. 5004.

---

[4]In *Rutan v. Republican Party of Illinois*, the Supreme Court held that: (1) promotions, transfers, and recalls based on political affiliation or support are impermissible infringements on public employees' First Amendment rights; and (2) conditioning hiring decisions on political belief and association violates applicants' First Amendment rights in the absence of a vital governmental interest. 497 U.S. 62, 62–63 (1990).

**SA4**

Meanwhile, the Special Master concluded her investigation of IDOT Staff Assistant practices and filed a report in May 2017. R. 4988; R. 5069 at 1. The investigation focused on the time period from 2009 to 2014. R. 4988 at 6. During her investigation, the Special Master interviewed IDOT employees and reviewed tens of thousands of documents. *Id.* at 6–7. The Special Master concluded that "the Governor's Office played a key role in the Staff Assistant abuse at IDOT." *Id.* at 5.

To address fallout from the political hiring of IDOT Staff Assistants, in December 2017, the Court issued an Order Creating a Review Process For Applications of Former Staff Assistant For Positions at IDOT. R. 5644. This is also known by a shorthand moniker, the "John Doe" Process, through which the Court and the parties evaluate what, if any, limits should be placed on the employment advantages that former IDOT Staff Assistants might reap from holding that position when applying for other non-exempt employment. R. 7083 at 17.

On exempt positions, in January 2019, the Court approved the Governor's Employment Plan for Exempt Positions and The General Principles and Commitments Applicable to Hiring. R. 6158. This plan outlined the process for converting positions from exempt status to non-exempt status and vice versa. R. 6158. On January 22, 2019, the Court approved the statewide Exempt List, which included exempt positions in IDOT. R. 6180. The Exempt List is updated monthly.

Beginning in late 2019, the parties began discussing the State's exit from the Consent Decree. *See* R. 6712 at 2 ("[t]he State has been very upfront in stating its intention to seek to exit the 1972 Decree"). In order to remedy concerns in statewide

5

**SA5**

hiring processes, the State proposed the implementation of a Comprehensive Employment Plan (often referred to as the CEP). R. 7083 at 44–45. The State filed the CEP with the Court on November 25, 2019. R. 6612-1, CEP. According to the Special Master, as of September 2020, significant parts of the CEP have yet to be implemented. R. 7083 at 46.

## II. Analysis

### A. Motion to Vacate

It makes sense to first tackle the State's motion to vacate the consent decree, R. 6946, because a win on that motion for the State would render the other motions moot. A consent decree, although contractual in nature, is enforceable as "a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Co. Jail*, 502 U.S. 367, 378 (1992). As a judgment, then, a consent decree is subject to modification or to vacatur via Federal Rule of Civil Procedure 60(b). *United States v. Krilich*, 303 F.3d 784, 789 (7th Cir. 2002) ("parties wishing to modify or vacate a consent decree may do so by resorting to Rule 60(b)"). Under Civil Rule 60(b)(5), the "court may relieve a party … from a final judgment, order, or proceeding … [if] the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). "The party seeking relief bears the burden of establishing that changed circumstances warrant relief, but once a party carries this burden, a court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Horne v. Flores*, 557 U.S. 433,

6

**SA6**

447 (2009) (cleaned up).[5] The movant's burden is met by showing a significant change either in fact or in law. *Rufo*, 502 U.S. at 384. Having said that, federal courts take special care to approach vacatur motions with flexibility when an "institutional reform" injunction is under scrutiny. *Horne*, 557 U.S. at 450. This ensures that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant. *Id.*

To apply a more concrete standard for evaluating whether to terminate the Consent Decree, in early 2020, the parties conferred and expressed different viewpoints to the previously assigned judge, Magistrate Judge Schenkier. *See* R. 6789-1, Exh. 3 (letter of Jan. 22, 2020). In a January 2020 letter to Judge Schenkier, the State expressed its belief that Rule 60(b), and the legal precedent interpreting it, provided the standard. *Id.* at 12.[6] This included the principles that (1) a "critical question" is whether the objective of the original order has been achieved; and (2) if a "durable remedy" is in place, then the decree must end. *Id.* at 13 (citing *Horne*, 557 U.S. at 450). In contrast, the Plaintiffs suggested applying the "substantial compliance" standard[7] contained in the supplemental relief orders that applied to other *Shakman*

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

[6]This page citation refers to the PDF page numbering in CM/ECF entry. R. 6789-1, which is a single PDF comprising multiple exhibits.

[7]The Plaintiffs' proposed standard also set forth specific benchmarks:

> a. the Governor's Office has implemented a new Employment Plan, including procedures to ensure compliance with the new Plan and identify instances of non-compliance;

7

defendants. *Id.* at 13. Later, in briefing the motion to vacate, the Plaintiffs have-acknowledged that the critical questions are (1) whether the objective of the original order has been achieved and (2) whether a durable remedy has been implemented. R. 6789 at 4.[8]

### 1. Changes in Law

As evidence of a significant change in the law, the State argues that, under contemporary Article III standing doctrine, the Plaintiffs would not have standing to pursue this case. R. 6946 at 35–39. Given the Consent Decree and the procedural posture of the case, however, the State is not requesting a formal finding that the Plaintiffs lacked standing to bring their suit in 1969. *Id.* at 36 n.3. Rather, the State

---

b. the Governor's Office has acted in good faith to remedy instances of non-compliance that have been identified, and prevent a recurrence;

c. the Governor's Office does not have a policy, custom, or practice of making employment decisions based on political factors except for positions that are exempt under *Branti v. Finkel*;

d. the absence of material noncompliance which frustrates the consent judgment's essential purpose. The Court may consider the number of complaints of unlawful political discrimination that the Inspector General has found to be valid. However, technical violations or isolated incidents of noncompliance shall not be a basis for finding that the Governor's Office is not in substantial compliance; and the Governor's Office has implemented procedures that will effect long-term prevention of the use of impermissible political considerations in connection with employment decisions.

R. 6789 at 4–5 n.3.

[8]It is worth noting that "durable remedy" too is not necessarily a self-defining term. In *Jackson v. Los Lunas Community Program,* the Tenth Circuit interpreted *Horne*'s reference to "durable remedy" simply "as recognition that fleeting federal compliance is insufficient to warrant relief." 880 F.3d 1176, 1202 (10th Cir. 2018). *Jackson* added that "a district court in assessing whether further oversight is equitable, may and should consider the totality of defendants' efforts to comply with federal law and defendants' commitment to remaining in compliance with federal law." *Id.* at 1202–03.

raises the weakened underpinning of standing as an equitable consideration under the Rule 60(b) analysis. *Id.*

Given the procedural history of the case and the entry of judgment decades ago, the State is right to refrain from making an outright subject matter jurisdiction challenge. "To hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation." *Rufo*, 502 U.S. at 389. Way back in 1970, before the entry of the Consent Decree, the Seventh Circuit upheld the Plaintiffs' claims against a challenge to standing. *Shakman v. Democratic Org. of Cook Cty.*, 435 F.2d 267, 270–71 (7th Cir. 1970) *("Shakman I")*. This specific holding has not been overturned. *See Shakman v. Clerk of Cook Cty.*, 2020 WL 1904094, at *9 (N.D. Ill. Apr. 17, 2020) ("we find the standing of voters and candidates to pursue claims under the 1972 Consent Decree to be well-settled"). In 1987, the Seventh Circuit re-examined the standing of independent candidates, voters, and taxpayers, but only as to "the constitutionality of politically-motivated *hiring* practices without any reference to other patronage-based employment practices—including the discharge scheme now forbidden by the [1972] consent decree." *Shakman v. Dunne*, 829 F.2d 1387, 1393 (7th Cir. 1987) (*Shakman II*) (emphasis in original). *Shakman II* clarified that the "combined impact of political hiring and firing practices—a significant part of the plaintiffs' original case—is therefore not before us on this appeal." *Id.* So *Shakman II* explicitly left intact the validity of the 1972 Consent Decree. *Id.* at 1399 ("we explicitly note that

9

**SA9**

nothing in our holding today can be construed as affecting the continued validity of the *Shakman* decree").

Having said that, in 2015, the Seventh Circuit instructed that the district court *must* consider the significant changes in voter standing as an *equitable* consideration in deciding Rule 60(b)(5) motions, even if an outright jurisdictional challenge to a decades-old decree was off the table. In *O'Sullivan v. City of Chicago*, the Seventh Circuit did express "serious concerns whether [voters] bring to the litigation the sort of concrete adverseness to fulfill the mandate of *Lujan*." 396 F.3d 843, 868 (7th Cir. 2005). Although *O'Sullivan* did not overturn *Shakman I*, the Seventh Circuit directed the district court to consider whether voters have the "incentive to vigorously litigate and present the matter of political patronage to the court in the manner best suited for judicial resolution." *Id.* (cleaned up). After *O'Sullivan* was decided, the City of Chicago filed a motion, back in the district court, under Rule 60(b) to vacate the 1983 consent decree. On appeal from the denial of that motion, the Seventh Circuit again instructed that the "district court should be guided by the current law of standing to determine whether the class of voters has the necessary interest in this litigation." *Shakman v. City of Chicago*, 426 F.3d 925, 936 (7th Cir. 2005).[9] But the opinion emphasized again that the Rule 60(b) decision on the 1983 consent decree would not affect the 1972 Consent Decree. *Id.* ("the protections contained in the 1972 Consent Decree … will remain in full force regardless").[10]

---

[9]The parties label this case as *Shakman IV*.

[10]Other cases cited by the State in its reply brief do not shed much light on the question at hand. *See* R. 7140 at 51–52. Two of them simply affirmed dismissals based on lack of standing (in one case) and mootness (in the other), but neither involved a motion to vacate a

10

The upshot of all this is that this Court must bear in mind—as it has throughout its oversight of the decree since its reassignment to this Court's calendar—that the concrete protection of First Amendment rights of public *employees* is the crucial purpose of the Consent Decree, not an amorphous vindication of voter interests and not an amorphous application of private-sector best-employment practices. That concrete First Amendment interest is what the Court has emphasized time and again during the periodic status hearings, balanced with the weighty governmental and public interest in alleviating federal-court oversight of State and local government institutions. In its analysis of the pending motions, the Court will maintain a laser focus on the First Amendment rights of public employees.

### 2. Changes in Fact

The State argues that factual developments, including the lack of ongoing federal law violations, render federal court oversight unnecessary. R. 6946 at 24–34, 39–42. Each of the State's specific contentions requires close examination—but first to put those factual contentions into the proper context, an explanation of the scope of the Consent Decree is needed.

---

consent decree. *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 145 (2011); *Aslin v. Fin. Indus. Regulatory Auth., Inc.*, 704 F.3d 475, 480 (7th Cir. 2013). Another actually undermines the State's position, because the Supreme Court held that Title VII did not preclude entry of a consent decree that would benefit non-victims of a defendant's discriminatory practices. *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 515 (1986). Still two others involved appeals of the *entry* of judgments. *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 924 F.3d 375, 380 (7th Cir. 2019); *Perkins v. City of Chicago Heights*, 47 F.3d 212, 215 (7th Cir. 1995). Neither case involved a Rule 60(b) motion. The final case is inapposite because there the Seventh Circuit decided that the Eleventh Amendment deprived the district court of subject matter jurisdiction, *David B. v. McDonald*, 156 F.3d 780, 783 (7th Cir. 1998), not that a lack of standing stood in the way.

### a. Scope of the Consent Decree

The State argues that the forced coercion of political work is the only possible violation of federal law under the Consent Decree. R. 7140 at 3. To the State's way of thinking, to the extent that the Decree sweeps broadly beyond coerced political work, these prohibitions "exceed the appropriate limits because they aim to eliminate conditions that do not violate federal law." *Id.* at 6 (*citing Horne*, 557 U.S. at 550). This characterization of the Consent Decree is too narrow.

The first problem with the narrow view is that the plain text of the Consent Decree says otherwise. Remember that Paragraph (E)(1) of the Consent Decree forbids the Office of the Governor from "conditioning, basing or knowingly prejudicing or affecting *any term or aspect* of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of *any political reason or factor*." Consent Decree ¶ (E)(1) (emphasis added). The ban on affecting "any term or aspect" of employment does not read like a ban solely on coerced political work. Nor does the forbidden motive—"any political reason or factor"—cover only a refusal to perform political work. As noted earlier, a consent decree functions both like a contract and a judgment. *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 519 (1986). "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *United States v. Armour & Co.,* 402 U.S. 673, 681 (1971). "In addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree." *Firefighters*, 478 U.S. at 525. Although "consent decrees

12

**SA12**

bear some of the earmarks of judgments entered after litigation … at the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts." *Id.* at 519. "For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Armour & Co.,* 402 U.S. at 682. The text of the Consent Decree protects current employees from more than just coerced political work: no "term or aspect" of employment (for non-exempt employees) can be prejudiced by "any political reason or factor." Consent Decree ¶ E(1).

It is true that "[c]onsent alone is insufficient to support a commitment by a public official that ties the hands of his successor." *Evans v. City of Chicago*, 10 F.3d 474, 478 (7th Cir. 1993). There must be some rule of law that binds the public official's conduct because a "state official's promise to follow a rule of federal law retains its force because of the continuing effect of the law, which the state cannot alter." *Id.* No problem there for the Consent Decree: Paragraph (E)(1) is on sound legal footing. The First Amendment protects non-exempt public employees from more than just coerced political work. This legal principle is well established by the *Elrod-Branti-Rutan* trilogy, as the State concedes. R. 7140 at 4 n.2; *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (explaining that First Amendment forbids employment dismissals based on political patronage); *Branti v. Finkel*, 445 U.S. 507, 517 (1980) (holding that a patronage dismissal violates the First Amendment even if there is no aspect of coerced political work); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 62 (1990) (holding that pro-

13

**SA13**

motions, transfers, and recalls based on political affiliation violates the First Amendment). So, for non-exempt public employees, a violation of Paragraph (E)(1) likely violates the First Amendment.

The State tries to distinguish the *Elrod*, *Branti*, and *Rutan* line of precedent based on *whose* rights are violated. R. 7140 at 4 n.2. Those cases hold, the State points out, that partisan employment actions violate public employees' rights rather than those of candidates or voters. *Id.* But this argument conflates standing to pursue claims that have already resulted in a decades-old consent decree with the evaluation of a Rule 60(b)(5) motion to vacate or to modify the decree. Indeed, there is no strict requirement that consent decrees must provide relief solely to individuals who would continue to have standing. Instead, a "federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." *Firefighters*, 478 U.S. 501 at 525 (upholding consent decree benefiting individuals who did not suffer injuries resulting from the illegal discriminatory practices). It is no surprise that consent decrees often secure protections beyond what is strictly required by the Constitution—the *remedy* for a past constitutional violation or to prevent future violations might very well go beyond what the government would have been required to do if it had just complied with the Constitution in the first place. *See Rufo*, 502 U.S. at 389 (explaining that "we have no doubt that, to save themselves the time, expense, and inevitable risk of litigation … petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself

14

**SA14**

requires … but also more than what a court would have ordered absent the settlement") (cleaned up); *Kindred v. Duckworth,* 9 F.3d 638, 641 (7th Cir. 1993) (explaining that "consent decrees often embody outcomes that reach beyond basic constitutional protections"). Courts are under no continual obligation to modify a consent decree so "that it conforms to the constitutional floor." *Rufo*, 502 U.S. at 391. In *Kindred v. Duckworth,* for example, the Seventh Circuit held that even state policies that otherwise withstand constitutional scrutiny are subject to consent decrees enjoining their implementation. 9 F.3d at 642. Of course, as *Kindred* instructs, if an institution believes that an otherwise-constitutional policy is unfairly enjoined by a consent decree, then the government may file a Rule 60(b) motion, and the district court will consider the legality of the policy as one of the equitable points in the balance. *Id.* at 644. As explained earlier, however, the current mismatch between the Plaintiffs and the public employees is just that—an important equitable consideration, not an as-a-matter-of-law-dispositive one.

Nor is the Consent Decree a mismatch for the First Amendment protections afforded to public employees, as the State argues. R. 7140 at 6. The State cites *Horne* for the "bedrock principle" that "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or … flow from such a violation." 557 U.S. at 450. That is perfectly accurate—but the Consent Decree does not exceed appropriate limits because it aims to eliminate conditions that violate the First Amendment, as held in *Elrod, Branti,* and *Rutan*. And *Horne* says nothing about whether courts have an ongoing obligation to update consent decrees

15

to afford relief only to those who have standing under contemporary Article III doctrine. The cases cited by the State do not require otherwise. R. 7140 at 6; *Evans*, 10 F.3d at 480–82 (vacating consent decree because the underlying substantive rule of law was overruled); *See Komyatti v. Bayh* 96 F.3d 955, 963. (7th Cir. 1996) (holding that "a federal consent decree can contain a provision not explicitly required by the Constitution as long as the criteria set forth in *Firefighters* are met").

Lastly, the State's reliance on the district judge's 1972 opinion in the case does not alter the scope of the Consent Decree. R. 7140 at 4–5. First, the opinion did not forecast the Supreme Court's eventual decisions on the scope of the First Amendment's protection against partisan employment decisions. The opinion held that political hiring and firing is lawful so long as there is no political *coercion. Shakman v. Democratic Org. of Cook Cty.,* 356 F. Supp. 1241, 1248 (N.D. Ill. 1972). The Supreme Court rejected this view in *Branti.* 445 U.S. at 517. Also, although the opinion commented in *dicta* that Paragraph E(1) was "unnecessary" and "neither mandated by the Court of Appeals or any case-law," the district court did not go so far as to modify the Decree. *Shakman*, 356 F. Supp. at 1248. Rather, the district court offered to "entertain motions to eliminate that clause from the consent decree." *Id.* at 1248–49. No motions asked for that. *See* R. 7166 at 3. All in all, then, the Consent Decree does protect public employees from First Amendment violations beyond just coerced political work.[11]

---

[11]The State also argues that the Decree only applies to employment within the Northern District of Illinois. R. 7140 at 7–8; Consent Decree ¶ B. In response, the Plaintiffs contend that the State never proposed that a different employment plan should apply outside the Northern District. R. 7104 at 22. The State also does not explain how this factors into the

Although the Consent Decree goes beyond coerced political work, the Decree's outer limits also require examination. Although there is some overlap in the employment practices banned by the Consent Decree and *Rutan*, their mandates are not co-extensive. The Consent Decree specifies that it protects persons who are already State employees; it enjoins the State from "conditioning, basing or knowingly preju-dicing or affecting any term or aspect of governmental employment, with respect to one who is at the time *already a governmental employee,* upon or because of any po-litical reason or factor." Consent Decree ¶ (E)(1) (emphasis added). *Rutan* held that promotion, transfer, recall, and *hiring* decisions based political patronage violates the First Amendment in the absence of compelling government interest. *Rutan*, 497 U.S. at 79. Because the First Amendment forbids hiring decisions for non-exempt positions to be infected with political considerations, even applicants who are not already pub-lic employees are protected by *Rutan*.

So, unlike *Rutan*, the text of the 1972 Consent Decree only covers employment decisions that affect current government employees. It is true that the Consent De-cree retained jurisdiction to address certain questions: (1) whether positions are le-gitimately exempt; that is, whether those positions can be properly filled based on political considerations, Consent Decree ¶ (H)(1)(a); *see also* R. 6946-2 at 14:16–19; and (2) whether political sponsorship or other political considerations be taken into

---

motion to vacate: on its own, the geographical restriction is not a reason to vacate the Consent Decree. What's more, the State never raised this issue in its response to the Plaintiffs' motion to appoint the Special Master, which sought an investigation into IDOT's statewide hiring practices. *See* R. 3809. The State declined another opportunity to raise this issue when re-sponding to the Plaintiffs' motion to expand the Special Master's authority to statewide ex-empt-hiring process with respect to other agencies. *See* R. 4725.

17

**SA17**

account in hiring employees, Consent Decree ¶ (H)(1)(b). But it does not appear that, with regard to the State of Illinois, the district court ever formally decided those questions and, more importantly, incorporated them into an Order (except in limited part, as discussed later in the Opinion).

Having said that, the Consent Decree's ban on employment decisions "prejudicing or affecting" current government employees based on political reasons can require some level of monitoring of hiring decisions. First and foremost, if a current employee applies for another State job opening, then Paragraph E(1) still bans political consideration in that hiring decision. Hiring an applicant for that job based on a political reason or factor would affect a current employee—and the Consent Decree forbids that. Second, partisan hiring into non-exempt positions would likely be significant circumstantial evidence that partisanship is infecting *other* employment decisions too, including those that affect current employees. It would be naïve to believe that a supervisor or decision-maker could be trusted to simply wall-off partisanship in hiring from partisanship in other important employment decisions, like promotions and firings. Third—as proven by the IDOT Staff Assistant debacle—political preference at the hiring phase *does* affect current employees when the politics-based job winners are later transferred or promoted to other State jobs sought after by current employees.[12] That is why Judge Schenkier, when appointing the Special Master,

---

[12]In the reply brief, the State argues, apparently for the first time, that the IDOT Staff Assistant employment decisions did not violate the Consent Decree to begin with. R. 7140. at 19–23. This argument is unpersuasive. First, the burden is not on the Plaintiffs or the Special Master to make findings of ongoing violations. The burden is upon the State to demonstrate that changed circumstances warrant relief. *Horne*, 557 U.S. at 447. Second, if the State is

agreed that "post-hiring practices regarding transfers, assignments, classifications and promotions" are "within the scope of the decree." R. 6946-2 at 12:15–24. The IDOC Staff Assistant scheme is indeed all the worse, as Judge Schenkier explained, because the scheme started with supposedly exempt hiring: "employees who were hired into staff assistant positions that were labeled as exempt [many of whom reportedly had political affiliations], and a later time transferred into non-exempt positions … leads to the possibility that their experience gained while nominally in an exempt position gave them a leg up on others who were unsuccessful in obtaining non-exempt positions." *Id.* at 13:1–11.

Lastly, hiring decisions are within the scope of the Consent Decree's reserved jurisdictional provisions. To the extent hiring decisions implicate concerns about whether the hire is for a legitimately exempt position, this is arguably covered by Paragraph ¶ (H)(1)(a) of the Consent Decree. Judge Schenkier reasonably found that it was. *See id.* at 15:16–18 ("[i]n these circumstances, I find that there is authority under the 1972 decree to address the plaintiffs' concerns about whether positions in IDOT labeled as exempt truly were and are exempt"). The Court also retained jurisdiction over the question of whether political sponsorship or political considerations

---

arguing that the Consent Decree did not confer the Special Master with authority to investigate Staff Assistant hiring, then that argument was correctly rejected by Judge Schenkier based on the Decree's jurisdictional provisions. R. 6946-2 at 15:15–18 (explaining that, "[i]n these circumstances, I find that there is authority under the 1972 decree to address the plaintiffs' concerns about whether positions in IDOT labeled as exempt truly were and are exempt."). Finally, if the State is arguing that the Consent Decree does not apply to the Staff Assistant decisions because those decisions supposedly only involved hiring, then that argument fails for the reasons explained in the text: the political hiring caused a ripple effect on current employees.

**SA19**

can affect hiring and how much. Consent Decree ¶ (H)(1)(b). Again, the text of the actual injunction as applied against the State is indeed limited to decisions that affect current government employees—but, in some circumstances, even those hiring decisions that do not directly involve a current-employee applicant can affect current employees. So, yes, the Court must apply the textual limit of protection for current employees, but event that limit allows for some level of monitoring of hiring decisions.

### b. Comprehensive Exempt List and Exempt Employment Plan

With those governing principles on the scope of the Consent Decree in mind, it is time to evaluate the factual changes proffered by the State in support of ending the Decree. First, in collaboration with the Special Master, Illinois has adopted a comprehensive statewide exempt list and employment plan for exempt positions. R. 6158; R. 6180. According to the State, this ought to satisfy the Plaintiffs' principal complaints leading to the Special Master's appointment. R. 6946 at 25. To be sure, these measures are steps in the right direction. But the devil is not just in the details, but in the implementation. The Special Master reasonably explains that drawing conclusions about the exempt employment plan's "overall impact" must await a later time. *See* R. 7083 at 14. (This is not to lay blame on any person or institution for delay, but is just a recognition of the complexity in implementing the plan.) What's more, the Consent Decree goes beyond just banning abuse of exempt positions to prejudice current employees; instead, no term or aspect of non-exempt employment can be riddled with political reasons.

20

Illinois also argues that the Consent Decree should sunset with the end of the Special Master's appointment. R. 6947 at 1. As support, the State points to a statement made by Judge Schenkier during an October 2014 hearing. During that hearing, the judge commented that the Special Master "performing those very targeted [assigned] functions *will not usurp the responsibilities of officials* to run the affairs of IDOT, but rather will *help* ensure that IDOT's employment practices comply with the requirements of the decree." R. 6946-2 at 17:7–11 (emphases added). Illinois also cites part of the November 2016 Opinion to equate the exempt-position problem with the end of the 1972 Decree. The opinion says that a "review of the exempt positions at the other agencies will allow the Court to ensure the requirements of the 1972 decree (and the constitution) are met by ensuring that only positions that truly qualify for exempt status receive that label, and that robust processes are in place to ensure that remains the case." R. 4798 at 3. But these statements merely expressed the judge's belief that the Special Master could help IDOT and the State with a specific aspect of statewide employment practices so that the government would comply with the Decree. It is difficult to discerns any intent to strictly connect the Special Master's discharge with the Consent Decree's sunset. Yes, the timing could coincide, and indeed with other government entities, the timing has coincided. But the simultaneity of Special-Master-discharge and Decree-termination is a product of the natural progress that is made so satisfy the Decree's directives when experienced and hardworking Special Masters and the government cooperatively work together. It is not a product of an order connecting the two.

21

**SA21**

### c. The OEIG and HEM

Next, the State argues that the OEIG and one of its divisions, the Hiring and Employment Monitoring Division (HEM), are "dispositive aspects of the State's durable remedy." R. 6946 at 26. The OEIG was established as part of the Illinois State Officials and Employees Ethics Act. 5 ILCS 430/20-10(a). In 2009, the Illinois General Assembly expanded the OEIG's jurisdiction to include the power to "review hiring and employment files of each State agency within the Executive Inspector General's jurisdiction to ensure compliance with *Rutan*[ ] … and with all applicable employment laws." 5 ILCS 430/20-20(9). To carry out this responsibility, in 2015, the OEIG created HEM, which conducts compliance-based reviews of State hiring and employment procedures to ensure that they are lawful, merit-based, and justifiable.

In the past, the previously assigned judge did not consider the OEIG and, later, HEM to be sufficient ways to erect a durable remedy—at least at the time. With regard to the OEIG, in appointing the Special Master in 2014, Judge Schenkier found that "the Inspector General's work in my judgment does not eliminate the need for the Court to take action to ascertain the extent of any violation of its order, the 1972 decree, and what steps are necessary to ensure that the decree will be followed in the future." R. 6946-2 at 16:10–16. With regard to HEM, in 2017, Judge Schenkier expanded the Special Master's role in part because he was "not convinced that the newly-created HEM unit currently possesses the experience or expertise to take on the investigation and review of exempt positions … for the entire state of Illinois without the active involvement of the Special Master." R. 4798 at 5. But that was

22

**SA22**

several years ago, the State argues, and now "there is no doubt about HEM's experience or expertise, and there is no question concerning the integrity, competency, or rigor of their monitoring of the State's hiring and employment." R. 6946 at 27. Illinois points to the size of HEM's staff, which comprises 10 full-time employees. *Id.*

The Plaintiffs respond that the OEIG's and HEM's efforts have not yet translated into meaningful changes. R. 7104 at 17. The Plaintiffs contend that State agencies regularly disregard HEM advisories on important measures, including conflicts-of-interest review and the application of minimum qualification requirements. *Id.* at 19. And there is an apparent lack of sanctions for disregarding the recommendations. *Id.* Furthermore, as the Special Master explains in her response brief, the CEP grants OEIG the discretion (not the duty) to investigate allegations of political contact or political discrimination. R. 7083 at 55; CEP XI.A.4.a-b. The Special Master also finds that "the current compliance framework does not always allow for transparent reporting in HEM Advisories." R. 7083 at 57. She explains how, as a policy, the OEIG does not permit HEM to reveal issues that are referred to the OEIG for investigation. *Id.* at 58. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. In reply, the State explains that state law mandates that all investigatory files and reports of the OEIG remain confidential. R. 7140 at 43; 5 ILCS 430/20-95(d).

Although there are sound policy reasons supporting the confidentiality of that information, the interest in confidentiality does not eliminate doubts about the efficacy of these institutions in preventing violations of the First Amendment. Again, this is not to lay blame on any institution or person, but rather a sign of just how difficult it is to protect public employees from partisan decision-making in employment. On the front end, partisan decision-makers naturally will make every effort to conceal the political bases of an employment decision. On the back end, current employees naturally fear retaliation for challenging or reporting potential violations. This is not an easy problem to solve.

Aside from concerns with the OEIG's and HEM's efficacy, the mere existence of these oversight institutions does not actually help the State's case when there is evidence of ongoing noncompliance with the Consent Decree or with processes—like the Comprehensive Employment Plan—that are designed to serve as the durable remedy against partisan decision-making. The message is not getting across to employment decision-makers that the OEIG and HEM will root out the problems and that there is a price to pay. Indeed, the OEIG investigated the IDOT's misuse of the Staff Assistant position and its findings contributed to the Special Master appointment. R. 3944-2, OEIG Final Report Case No. 11-01567. According to the Special Master, as "of September 14, 2020, HEM has issued 80 Advisories regarding 53 term appointment renewal hiring sequences; 15 complaint referrals; and 12 non-term ap-

24

**SA24**

pointment hiring sequences." R. 7083 at 49. The Special Master also reasonably concludes that "HEM routinely identifies violations of the CEP or current CMS guidance." *Id.*

To be clear, the Court most certainly is *not* saying that Illinois put itself in a worst position (Decree-termination-wise) by expanding the OEIG's authority and by creating HEM. To the contrary, the OEIG's—and really HEM's—efforts are the best points in the State's favor when evaluating whether Illinois has fashioned a durable remedy. But the State's obligations under the Consent Decree do not end with merely *identifying* partisan decision-making. Rather, as much as is reasonably practicable, Illinois must implement a durable remedy that prevents political-patronage employment decisions that affect current employees. Consent Decree ¶ (E)(1). If the State's oversight mechanism is merely uncovering noncompliance with the Decree or noncompliance with the other processes that are in turn designed to prevent noncompliance with the Decree, then that mechanism cannot carry the day for Illinois in terminating the Decree.

### d. Continuing Violations

The remainder of the State's arguments, in essence, contend that Illinois is in compliance with the Decree and that judicial intervention is no longer necessary. R. 6946 at 28–34, 39–42. According to the State, neither the Special Master nor the Plaintiffs can produce evidence of illegal political discrimination in the past six years. *Id.* at 30–31. The first problem with this argument is that it misstates where the burden of proof lies. As the party seeking relief from a judgment, the State bears the

25

**SA25**

burden. *Horne*, 557 U.S. at 447 (2009). Second, although the Special Master has noted significant progress in fashioning preventive measures to protect employees, she also has highlighted areas of ongoing concern from which inferences of First Amendment violations can be drawn. Not all of the examples are particularly damning—but some are.

For example, in the Sixth Report Regarding Statewide Compliance, the Special Master highlighted the use of Personal Service Contracts (PSCs) to manipulate hiring sequences. *See* 6710 at 11–14; R. 7083 at 28. In late 2018, the Department of Human Services (DHS) posted an opening for an Employment First Coordinator, a non-exempt position. *Id.* at 11. The Special Master reviewed the hiring sequence in Fall 2019 after learning that the selected candidate was never hired. *Id.* Based on that review, the Special Master determined that DHS abruptly terminated the position before the presumptive hire was offered the position. *Id.* Instead, a different candidate, who had declined to interview for the position because of an unwillingness to relocate, was hired on a PSC without going through the non-exempt interview process. *Id.* According to the Special Master, DHS circumvented the competitive non-exempt hiring process to favor a pre-selected candidate. *Id.* at 14.

That was not the only instance of PSC misuse and failure to follow anti-political processes. In February 2020, the OEIG issued a report, OEIG Report 14-01678, on misuse of PSCs by the Department of Agriculture. In a supplement to the Sixth Report, R. 6919, the Special Master explained that, between 2007 and 2015, the Agriculture Department had entered into 633 PSCs with 269 separate employees, *id.* at

26

4. Many of them were rehires. *Id*. The Special Master explained that, in "the overwhelming majority of PSCs reviewed, Agriculture could not demonstrate that it adhered to the *Rutan* hiring guidance." *Id*. Although the OEIG did not find direct evidence that PSCs were awarded based on political considerations, it noted the "potential for improper political hiring to occur." *Id*. at 5. That is not surprising: one purpose of fashioning and applying employment-decision processes designed to prevent partisan decisions is to increase transparency, thus deterring First Amendment violations. Absent compliance with those processes, going back after the fact to uncover political hiring is difficult.

Nor is it likely that the PSC misuse will be solved by CEP itself. Although the Plan does set forth a provision that governs PSCs, the Special Master explains that the language is nearly identical to the previous policy on PSCs, fails to address manipulation of PSCs, allows exceptions for individuals previously hired through PSCs outside of the *Rutan* requirements, and does not include any meaningful enforcement mechanism. R. 7083 at 30. She also points out that prior PSC policies have often been ignored. *Id*. Moreover, despite the CEP's requirement that agencies submit quarterly reports to CMS on the use of PSCs, as of September 2020 no reports had been submitted. *Id*.

In response, the State argues that without direct evidence of political decision-making, the Special Master's concerns about PSCs do not provide probative evidence of noncompliance. R. 7140 at 32. It is true that direct evidence of political motivation is absent in those examples. But those facts do demonstrate how PSCs can provide a

workaround to the protocols that are supposedly in place to prevent political hiring, which naturally raises the question of whether non-exempt positions are being impermissibly filled based on political reasons.

Another area of concern identified by the Special Master is the use of seasonal, emergency, and temporary hires. R. 7083 at 24–28. In her Fifth Report, the Special Master explained that many of the IDOT Staff Assistants hired from 2010 to 2011 were designated as supposed "emergency employees." R. 5012 at 34–37. A number of these hires had connections to politicians and high-level government officials. *Id.* In her initial report, the Special Master discussed the IDOT's hiring of seasonal Highway Maintainers, known as Snowbirds. R. 4128. at 22–23. The report noted that "Clout Lists," from back in 2003, revealed that at least ten Snowbirds were hired based on recommendations from former Chicago Alderman Richard Mell. *Id.;* R. 4128-2 at 33. Although the Clout Lists are outdated, the Special Master points out that, as recently as 2015, Snowbird hiring is directly handled by district personnel offices with a lack of uniformity and very little oversight. R. 4128 at 22. The OEIG also discovered that, from 2013 to 2017, the DOA hired seasonal state fair workers without conducting *Rutan* interviews, and improperly designated them as exempt. OEIG Case 14-01678 Report at 18–19.

████████████████████████████████

████████████████████████████████

████████████████████████████████



The Special Master points to a number of other practices that pose a threat to the State's implementation of a durable remedy. Again, on review of those practices, the Court does not view some of them as posing a substantial risk of political decision-making (as distinct from best-human-resources practices). R. 7083 at 18–19 (reachability); *id.* at 35 (bypass process). But two of the identified problems do pose that risk:

- **Cancelled Sequences:** Agencies can terminate a job posting during a hiring sequence when they—supposedly—no longer want to fill the opening. R. 7083 at 40. In one example, an agency cancelled a hiring sequence for a position requiring a Master's of Social Work degree. *Id.* at 41. The agency later reposted the opening, now stating that an MSW

29

or related degree sufficed. *Id.* This favored a preferred incumbent candidate who had an M.A. in a related field but not an MSW. *Id.* (This is an instance of a decision-making involving a current employee.)

- **Vetting of Conflicts:** The Special Master identified problems with improper documentation and vetting of conflicts of interests in hiring sequences. R. 7083 at 42.

In light of the uncertain efficacy of the OEIG and HEM (again, without laying blame at their doorstep), the nascent implementation of the Comprehensive Employment Plan, the failure to prevent misuse of Personal Service Contracts, and the frequency and nature of the other practices discussed above that would allow political considerations to affect current State employees, now is not the right time to terminate the Consent Decree—a durable remedy is not yet in place. It bears repeating and emphasis that this is not to cast pejorative criticisms on any particular institution or person. It just is not easy to durably protect State employees from partisan decision-making in employment, because those in power will do much to keep unlawful employment decisions out of the light and employees who lose out naturally fear retribution if they speak up. Nor does the Court downplay the significant progress made by the State, especially in the past two years, toward implementing a durable remedy. Indeed, as the implementation of the CEP continues, and as HEM continues its efforts and—it is hoped—increases its impact on State agencies, then the Court would be receptive to consider another motion to terminate in the last quarter of this

year. If the Sheriff of Cook County, the Forest Preserve District, the City of Chicago, and Cook County can do it, so can the State.[13]

### B. Scope of the Special Master's Authority

Separately, the Plaintiffs have moved to clarify the scope of the Special Master's authority, or in the alternative expand her responsibilities "to include the power to investigate and report on the compliance of all agencies under the jurisdiction of the Governor with the Court's 1972 Decree and supplemental relief orders and *Rutan*." R. 6789 at 22. In their reply brief, the Plaintiffs appear to scale back their requested expansion to "monitor[ing] implementation of the CEP … and related policies, and report to the Court and the parties." R. 7104 at 39. In contrast, the State argues that the Special Master has completed her responsibilities, so Illinois seeks a vacatur of the appointment. R. 6947 at 1, 26.

### 1. Orders Conferring Authority

The initial 2014 Order appointing the Special Master authorized her to perform five duties:

> (i) investigate the scope and reason for any violations of the 1972 Decree regarding the Illinois Department of Transportation ("IDOT"), (ii) recommend measures that may be necessary or appropriate to prevent any recurrence, (iii) assess the implementation of those efforts to ensure that they are effective; (iv) address whether positions in IDOT labeled as exempt were properly exempt under applicable legal principles, and (v) make recommendations for how to remedy any violations of the 1972 Decree.

---

[13]It is worth noting that all of those institutions exited from the case with the agreement of the Special Masters assigned to those institutions.

31

R. 4020 ¶ 3. The order also says that the Special Master "shall only have the duties, responsibilities and authority conferred by this Order and subsequent Court Orders regarding such duties." *Id.* Also, the Court denied other forms of requested relief similar to those contained in supplemental relief orders entered against other defendants. R. 3744 ¶ 23.

In appointing the Special Master, Judge Schenkier reasoned that, despite the OEIG's efforts, the Court nonetheless needed to undertake "action to ascertain the extent of any violation of its order, the 1972 decree, and what steps are necessary to ensure that decree will be followed in the future." R. 6946-2 at 16:10–16. The judge found "that function is best carried out by an officer who is appointed by the Court who is acting under the auspices of the Court." *Id.* at 16:16–18. The Court also concluded that "compliance with the decree is best served by having a transparent process in which an agent of the Court is involved in further investigating the scope and reason for what occurred, recommending the measures that may be necessary to prevent any recurrent and then in assessing the implementation of those efforts to ensure that they are effective." *Id.* at 16:25–17:6. Lastly, the judge expressed a preference for a court-appointed officer to assemble relevant evidence rather than engage in adversarial litigation to flush out the facts. *Id.* at 18:5–17.

In May 2017, Judge Schenkier expanded the Special Master's authority (1) to review all positions under the jurisdiction of the Governor that are identified as exempt to determine whether the Governor has adequately demonstrated that the positions meet the *Branti* standards; (2) to develop an approved and comprehensive list

32

**SA32**

of all *Rutan*-exempt positions across all agencies in the state (the Exempt List); (3) to develop procedures for correcting and revising the Exempt List; and (4) to analyze any *Rutan*-exempt positions that are also protected under either the State Personnel Code or are subject to a collective bargaining agreement and make recommendations about whether these positions may continue to be classified as exempt and still adhere to the *Branti* criteria. R. 4798 at 6–7. After that, Judge Schenkier entered an order instructing the Special Master to "work with the Parties to develop a list … of all positions under the jurisdiction of the Office of the Governor of Illinois … that are exempt from restrictions on hiring or affecting conditions of employment on the basis of political reasons or factors." R. 5004 ¶ A. That order also authorized the "continuing monitoring of the foregoing activities by the Special Master and Plaintiff's counsel." *Id.* ¶ C.

In the opinion expanding the scope of the Special Master's authority, Judge Schenkier reasoned that "involving the Special Master in the endeavor from the outset will better promote effectiveness of the review, and will cost the State less money in the long run." R. 4798 at 4. He also expressed his confidence in the Special Master's experience, noting that she helped shepherd the City of Chicago out from under their *Shakman* obligations. *Id.* Although not intending to criticize HEM, Judge Schenkier was "not convinced that the newly-created HEM unit currently possesses the experience or expertise to take on the investigation and review of exempt positions … for the entire state of Illinois without the active involvement of the Special Master." *Id.* at 5.

**SA33**

## 2. State's Motion to Vacate Appointment

With those appointment orders as the backdrop, the right place to start in considering the dueling motions is the lower bound of the issue, that is, the State's request to discharge the Special Master and vacate the orders supplying her authority.

The Governor contends that the Special Master has completed her court-ordered mandate. R. 6947 at 26. The Court disagrees. First, the 2014 Order assigned the Special Master the duty to "recommend measures that may be necessary or appropriate to prevent any recurrence" of *Shakman* Decree violations and "assess the implementation" of those efforts. R. 4020 at ¶ 3. According to the Special Master herself, as of September 2020, several of her recommendations have not been implemented by IDOT. *See* R. 7083 at 9–12. These include maintaining accurate position descriptions and objective minimum requirements, improving conflicts of interest policies, and completing an internal audit of all *Rutan*-covered position descriptions at IDOT. *Id.*

On top of that, the Special Master also identifies pending tasks under the 2017 Order. Although the Court has approved the statewide Exempt List and the Comprehensive Employment Plan for Exempt Positions, R. 6180, R. 6158, the Special Master has raised some concerns about their implementation, R. 7083 at 10 n.13 ("[a]lthough the selection process of converting previously exempt position[s] into covered positions is completed, many of those sequences raised concerns about improper applica-

34

**SA34**

tion and vetting of conflicts of interests, improper application of minimum qualifications and scoring anomalies"). It is true that significant progress has been made, but the Special Master has not exhausted her mandate.

Furthermore, although the State argues that the work of OEIG and HEM render judicial oversight unnecessary, *see* R. 6947 at 20–22, 29–30, as explained earlier HEM is still a relatively new institution. R. 4798 at 5. The Court shares Judge Schenkier's view that continued collaboration amongst the Special Master, the OEIG, and HEM remains "the most efficient and cost-effective" approach. R. 4798 at 8. Indeed, the Special Master has displayed awareness to monitor with a lighter touch as HEM becomes more and more established. In the Special Master's Sixth Report, she reported that "HEM reviews the appointment paperwork for each appointment [t]o Exempt List positions," so "[t]o avoid duplication of efforts, the Special Master's office has not played an active role in reviewing each appointment in recent months." R. 6710 at 28. Illinois argues that this evinces the Special Master's intent to yield exempt review to HEM. R. 7140 at 23. Far from "yielding" exempt review, the Special Master is simply following her instructions to work efficiently.

The State also asserts that Judge Schenkier instructed the Special Master to "facilitate the fastest and most efficient transfer of knowledge and experience from the Special Master to HEM unit employees so that they may carry more of the burden." R. 6947 at 16. Illinois cited that directive from the 2016 opinion, and the State argues that the Special Master is phasing herself out by relinquishing more autonomy to HEM's self-policing. R. 4798 at 6. That is all well and good, but it does not

**SA35**

evince an intent to terminate the Special Master's appointment when concerns of HEM's efficacy (as discussed earlier) still abound.

The State also tries to rely again on its arguments for vacating the Consent Decree. But those arguments have now been rejected. Nor do the cases cited by the State support its position. *See* R. 6947 at 18–19 (citing *Plotkin v. Ryan*, 239 F.3d 882 (7th. Cir. 2001); *Salazar by Salazar v. D.C.*, 896 F.3d 489 (D.C. Cir. 2018)). *Plotkin* is a case about standing. 239 F.3d at 884–85. It says nothing about discharging a Special Master. *Salazar* is inapposite because there the plaintiff was the one seeking relief, so the plaintiff bore the burden. *Salazar,* 896 F.3d at 498. Second, *Salazar* simply explains that the standard for modifying a consent decree is less demanding than the standard for obtaining a preliminary injunction in the first instance. *Id.* at 497–98. The opinion cautioned that, in the rare instance that a plaintiff, as the non-enjoined party, seeks to modify a consent decree, "courts must be careful to ensure that the new injunctive terms give effect to and enforce the operative terms of the original consent decree … [and] may not, under the guise of modification, impose entirely new injunctive relief." *Id.* at 498. It is not the Plaintiffs who seek a vacatur of the appointment order.

As a related argument, the State asserts that, after six years of work with IDOT, the Special Master's continued issuance of recommendations and assessment of their implementation would create new injunctive-relief requirements. R. 6947 at 24. But the Special Master has, in the words of the State, merely "recommended" and "assessed" for six years. R. 6947 at 27. The mere continuation of the Special Master's

36

**SA36**

work will not create new injunctive requirements when they were not injunctive to begin with. *See Bogard v. Wright*, 159 F.3d 1060, 1063 (7th Cir. 1998) ("the extension of the monitor ... did not continue the injunction because the appointment of the monitor was not itself an injunction"). For all of these reasons, the Court denies the State's motion to discharge the Special Master and to vacate the appointing orders.

### 3. Request to Expand Authority

Now for the outer bound of the Special Master's authority. At least initially, the Plaintiffs proposed expanding the Special Master's responsibilities "to include the power to investigate and report on the compliance of all agencies under the jurisdiction of the Governor with the Court's 1972 Decree and supplemental relief orders and *Rutan*." R. 6789 at 22. This would be too expansive for four reasons.[14] First, the Governor is not party to any supplemental relief orders, so of course that part of the proposal does not apply at all.

Second, although there is some overlap between the Consent Decree and *Rutan*, the State's obligations under them are not co-extensive. As discussed in connection with the State's motion to terminate the Consent Decree, the Decree bans conduct that is narrower in scope than *Rutan*. The Decree only prohibits political em-

---

[14]Although the Court agrees with the State that this broad interpretation of the Special Master's charge is "impermissible," it is not because of the Governor's reliance on *Cobell v. Norton,* 334 F. 3d 1128 (D.C. Cir. 2003); R. 6974 at 24. There, the court-appointed a monitor under a nebulous "inherent power" that it did not have. *Cobell*, 334 F.3d at 1141. The D.C. Circuit specifically distinguished this from the "practice of a federal district court appointing a special master pursuant to Rule 53 to supervise implementation of a court order." *Id.* at 1142.

**SA37**

ployment actions to the extent that they affect a *current* government employee. Although hiring of outside candidates can still affect current employees (as discussed earlier in the Opinion), the Consent Decree does not provide the Special Master with plenary authority to address hiring of outside candidates if no current government employee applied for the position. That is beyond the scope of the Consent Decree. (Again, this Opinion explained earlier how those hiring decisions *can* affect current employees, in which case the Special Master would have authority to address those decisions.)

Third, the record does not justify granting the Special Master authority to actively monitor *all* State agencies for compliance with every aspect of the Consent Decree. To date, the Special Master's authority drew upon incremental conferrals relying upon robust and highly probative evidence of noncompliance with the Consent Decree or noncompliance with processes put in place to prevent violations. In appointing the Special Master, Judge Schenkier relied on a detailed OEIG investigation, which concluded that IDOT "approved the hiring of persons into the nominally *Rutan*-exempt Staff Assistant positions to perform duties of *Rutan*-covered positions or duties that would *not* support *Rutan*-exempt status," and then "in some cases, transferred Staff Assistants into *Rutan*-covered positions, without following the *Rutan* hiring process." R. 3944-2 at iii-iv; R. 3944-4 at 182. In addition, the OEIG investigators "identified a number of persons who had been hired into *Rutan*-exempt Staff Assistant positions who had some sort of affiliation or association with an elected official" and found "evidence that a number of persons hired into Staff Assistant positions

38

stated they obtained their position as a result of some sort of political affiliation." R. 3944-4 at 197–98. These OEIG findings evinced Consent Decree violations because "some of those people who obtained staff positions already were employed at the Department of Transportation … others were hired into the positions from outside IDOT, and then later formally obtained non-exempt positions through transfers or an application process ... [a]nd according to the Inspector General report, some of the people who were hired into the staff assistant positions … had partisan political connections." R. 6946-2 at 8:10–18. Judge Schenkier also tied the Special Master's initial mandate to the jurisdiction-retention provisions of the Consent Decree, "under the decree, the Court also retained jurisdiction to address disputes about whether particular job positions are legitimately exempt." *Id.* at 14:16–18.

Expanding the Special Master's authority in 2017 to statewide review of exempt positions was a logical progression because, as Judge Schenkier noted, the "Special Master's work revealed that part of the problem at IDOT resulted from a lack of effective oversight policies at [CMS] which has authority to approve exempt job designations statewide." R. 4798 at 3. Again, Judge Schenkier tied expansion to the Decree's jurisdiction-retention provisions, and concluded that a "review of the exempt positions at the other agencies will allow the Court to ensure the requirements of the 1972 decree (and the constitution) are met by ensuring that only positions that truly qualify for exempt status receive that label, and that robust processes are in place to ensure that remains the case. *Id.*; *see* Consent Decree ¶ (H)(1)(a).

To now provide the Special Master with statewide authority to monitor all agencies for compliance with all aspects of the Consent Decree is neither substantiated by robust findings nor a logical extension of the Special Master's previously defined role. More robust findings, commensurate with OEIG's investigation of IDOT, would be needed to warrant an expansion of that magnitude. To be clear, by declining to confer plenary authority to the Special Master for all statewide employment practices, the Court is *not* concluding that the State has fashioned a statewide durable remedy; the Court found otherwise as explained earlier.

In their reply brief, the Plaintiffs appear to narrow the scope of their requested expansion to "monitor[ing] implementation of the CEP (whether in its current form or as modified by the Governor after discussions with the Special Master and Plaintiffs) and related policies, and report to the Court and parties." R. 7104 at 39. In contrast to the more expansive request, this request is justifiable for four reasons.

First, many of the Special Master's identified concerns may be addressed by monitoring implementation of the CEP. The CEP, as currently constituted, contains provisions addressing minimum qualifications (CEP ¶ IV.G); accurate position descriptions (*id.* ¶ IV.H); disclosure of conflicts (*id.* ¶ IV.L); sequence cancellation (*id.* ¶ V.L.); temporary and seasonal assignments (*id.* VIII); personal service contracts (*id.* ¶ IX); and the scoring and screening of applications (*id.* ¶¶ IV.M, IV.H, V.J).

Second, the proposal naturally and logically expands on work that the Special Master is already doing and does not stray far from her authority as currently defined. The 2014 Order instructed the Special Master to "make recommendations for

40

**SA40**

how to remedy any violations of the 1972 Decree," R. 4020 ¶ 3, which should include recommendations for implementing and amending a plan proposed by Illinois as a means of exiting the Consent Decree, *see* R. 7083 at 45 ("the State proposed, and the parties agreed that a Comprehensive Employment Plan was necessary"). And since early 2018, the Governor has collaborated with CMS, HEMS, and the Special Master to write concrete provisions of the CEP. R. 6710 at 19. Many of the Special Master's recommended provisions were ultimately included in the CEP filed with the Court (but not all). *Id.*

This leads to the third reason for a modest expansion. The proposal reasonably encompasses the Special Master's outstanding tasks and remaining concerns regarding the CEP. According to the Plaintiffs, they believe that the Special Master shares their several objections to the proposed CEP. R. 7104 at 24. The Special Master reported that, as of September 2020, major portions of the CEP have not been rolled out or implemented, R. 7083 at 45–47, and reports during subsequent status hearings confirm the ongoing and challenging rollout. This includes adoption of the new electronic hiring system. *Id.* at 46. Although the Special Master should not be scrutinizing every single posting and hiring sequence documented by the system, it is sensible for her to continue to monitor its implementation. The Special Master also expressed concerns about whether obligations under the CEP are being regularly followed. *Id.* at 47–48. According to dozens of HEM advisories, many State employees have not been trained on the CEP and many hiring managers are unaware of its requirements.

**SA41**

*Id.* at 48–53. These advisories have identified issues with vetting conflicts, inconsistent position descriptions, and insufficient documentation of hiring sequences. *Id.* at 49. Given the Special Master's collaborative history with the State on the CEP, and her remaining concerns on its implementation and enforcement, the Special Master's continued involvement will serve the goals of efficiency and cost-effectiveness. *See* R. 4798 at 8.

Fourth and finally, court-appointed monitors greatly helped other *Shakman* defendants by shepherding the implementation *and* subsequent revision of employment plans to exit the case. *See* R. 1984 ¶ 3 (Sheriff of Cook County); R. 3256 ¶ 2 (Forest Preserve District); R. 3861 ¶¶ 2,4 (City of Chicago); R. 6078 ¶¶ 2, 4 (Cook County). Although those Defendants were subject to supplemental relief orders that specifically included the implementation of hiring plans into the definition of "substantial compliance," *see e.g.* R. 3256 ¶ 4, the framework is nonetheless instructive. As the court-appointed monitor for the City of Chicago, the Special Master found that the City achieved substantial compliance after reviewing its adoption of city-wide hiring plans. R. 3256 ¶ 2. To be clear, the Court is not holding Illinois to the same standard contained in other supplemental relief orders. Rather, the point is that continuing to work collaboratively with the Special Master provides the clearest path to terminating the Decree.

### 4. Clarification of Authority

For the reasons discussed, going forward the Special Master is authorized to:

1.    Assess the implementation of the CEP (including the Electronic Hiring Plan) and make recommendations on the implementation of the CEP

**SA42**

(including proposing amendments to the CEP) that would assist in preventing violations of the 1972 Consent Decree.

2.  Investigate particular hiring sequences if, in the course of assessing the CEP, the Special Master finds a reasonable basis to believe that the sequence involves a potential violation of the 1972 Consent Decree (bearing in mind that the Decree applies to current government employees but also bearing in mind that hiring can affect current employees in various ways, as discussed earlier in the Opinion).

3.  Assess the implementation and enforcement of the Comprehensive Employee Plan for Exempt Positions, the statewide Exempt List, the John Doe Process, and finalize any outstanding proposals for modifications of the Plan, List, and the Process.

### IV. Conclusion

The State's motion to terminate the Consent Decree is denied and the cross-motion to vacate the appointment of the Special Master also is denied. The Plaintiffs' motion to enforce or to clarify is granted in part and denied in part.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2021

43

**SA43**

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on July 7, 2021, I electronically filed this brief and short appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.

All participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER